(No. 67201.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. TYRONE STRICKLAND, Appellant.

*Opinion filed December 4, 1992.—Rehearing denied March 29, 1993.*

494

Charles M. Schiedel, Deputy Defender, of Springfield, and Charles W. Hoffman, Assistant Appellate Defender, of Chicago, both of the Office of the State Appellate Defender, for appellant, and Tyrone Strickland, of Pontiac, appellant *pro se.*

Roland W. Burris, Attorney General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Terence M. Madsen, Assistant Attorney General, of Chicago, and Renee Goldfarb and Marie Quinlivan Czech, Assistant State's Attorneys, of counsel), for the People.

CHIEF JUSTICE MILLER delivered the opinion of the court:

Following a bench trial in the circuit court of Cook County, the defendant, Tyrone Strickland, was convicted of murder and of several related offenses. At a separate sentencing hearing, the trial judge found the defendant eligible for the death penalty on the ground that the murder victim was a police officer killed in the line of duty. (See Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(1).) The judge found no mitigating circumstances sufficient to preclude imposition of the death penalty and accordingly sentenced the defendant to death. The judge sentenced the defendant to terms of imprisonment for the remaining convictions. The defendant's death sentence has been stayed pending direct review by this court. (Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d Rules 603, 609(a).) For the reasons set forth below, we reverse one of the defendant's convictions for armed robbery and vacate the sentence imposed for that offense, but affirm the judgment of the circuit court in all other respects.

The defendant's convictions are based on a series of offenses committed by him and his brother, Larry Strickland, on November 5, 1985. In a separate trial, Larry was convicted of the same offenses charged here and was sentenced to life imprisonment. The present appeal involves only the defendant's convictions and sentences.

According to the evidence introduced at the defendant's trial, the defendant and his brother drove to a residential area in Wheeling to look for an acquaintance named "C.C." The Stricklands were residents of Ford Heights. Around 7:30 p.m., Christine Hodge heard a sliding door open and found two men standing outside. One of them explained that they were looking for an individual named "C.C." Hodge replied that "C.C." did not live there and slammed the door. She then called the police. The Stricklands left the premises and proceeded onward, encountering another resident of the housing development, Gale Ross. Ross reported the incident to her husband, who then went outside to investigate. After speaking with one of the men, whom he later identified as Larry, Mr. Ross pointed to a nearby building where he believed someone answering C.C.'s description might live.

Officer Kenneth Dawson was the first officer to respond to Hodge's call, arriving on the scene shortly after 7:30 p.m. According to the statement the defendant made to an assistant State's Attorney, the defendant said that his brother threw an object into the grass as he approached Dawson. Dawson and Larry then began to argue, and the defendant went to retrieve the object Larry had tossed away. The defendant picked it up, realized it was a gun, and walked over to where the officer and Larry were arguing. In his statement, the defendant said that he was "stunned" to see the officer restraining Larry. The defendant said that he then shot Officer Dawson; after the officer fell to the ground, the defendant

reached down and took the officer's gun. We note that several prosecution witnesses gave testimony supporting the defense theory in this case that the officer was shot by Larry Strickland and not by the defendant. This testimony is discussed in greater detail later in this opinion.

After Officer Dawson was shot, the defendant and his brother returned to their car and started to drive off. As they were leaving the area, Officer William Stutzman of the Wheeling police department arrived. Officer Stutzman stopped his vehicle at an angle in an attempt to block the offenders' escape. They swerved around him, however, as he shouted at them to halt. Officer Stutzman testified that the defendant, who was sitting in the front passenger seat, fired several shots at him through the windshield of the getaway car.

In his statement, the defendant said that his brother then drove to Buffalo Grove, a short distance away. At some point during the trip the defendant gave the murder weapon to Larry, keeping for himself the gun he had taken from Officer Dawson. The defendant and his brother abandoned their car in Buffalo Grove and set off on foot. They later came upon an older man, Donald Hamburg, parked in front of a house. At gunpoint, they ordered Hamburg to drive them to California. With Hamburg at the time were his nine-year-old grandson, Daniel Johnson, and his 15-year-old nephew, David Duvall. Hamburg drove some distance on expressways and eventually reached the downtown area of Chicago. During the trip, the defendant and his brother sat in the back seat of the car, and Hamburg and the two boys occupied the front seat. Throughout the journey, the two men in the back seat threatened to "pop" Hamburg and the boys if they failed to cooperate. At one point, Hamburg heard the man sitting behind him, who would have been Larry, ask the other whether he had seen what he (Larry) had done to the officer. After Hamburg left the

expressway, he saw a marked police car at a nearby intersection. Hamburg stopped his own vehicle in front of the squad car and got out to alert the officer, Edward Gross. The defendant and his brother then fled from the Hamburg vehicle on foot; at one point, the defendant turned and fired at Officer Gross. The defendant and his brother then split up; they were soon found in separate hiding places nearby. When arrested, the defendant was in possession of Officer Dawson's gun; Larry Strickland was found with the murder weapon.

The defendant was questioned by authorities later that night. He gave two oral statements—one to several police officers, and a second to an assistant State's Attorney. The statement made to the assistant State's Attorney was introduced into evidence during the State's case in chief, and the statement made to the police officers was introduced during rebuttal. In both statements, the defendant admitted performing the acts that caused Officer Dawson's death. The defendant said that he was "stunned" when he saw the officer pushing and shoving his brother. The defendant also described the other offenses that he and his brother committed, including the shooting of Officer Stutzman and the drive with Hamburg. He denied, however, that he shot at Officer Gross.

Several witnesses were called to testify in the defendant's behalf at trial. Heather Linehan, a fire department paramedic, testified that she was summoned to a police station to treat the defendant around 9 or 9:30 p.m., following the defendant's arrest. The defendant was hyperventilating, and she had him breathe into a paper bag to restore his respiration. Linehan explained that hyperventilation is generally precipitated by emotional stress. Carol Dalton testified in support of the defense theory that Officer Dawson was shot by Larry Strickland rather than by the defendant. Her testimony will be discussed in greater detail later in this opinion.

The defendant also testified in his own behalf at trial. He admitted shooting Officer Dawson but insisted that the killing was accidental. According to the defendant, Officer Dawson was asking Larry about a key and drugs. Believing that Larry might have tossed away drugs or a key to a safe deposit box when the officer arrived, the defendant bent down to look for the object Larry had thrown into the grass. The defendant kicked something, picked it up, and ran toward the officer, intending to give it to him. The defendant saw that it was a gun. The defendant testified that he then said something to Dawson, who looked up and made a motion as if to draw a gun from his holster. According to the defendant, Dawson's arm hit his arm, and the gun the defendant was holding then discharged. In his trial testimony, the defendant described the escape from the scene, the encounter with Donald Hamburg, and the drive to Chicago. The defendant admitted shooting at Officer Stutzman in Wheeling, but he denied firing any shots at Officer Gross in Chicago.

In rebuttal, the prosecution called Wheeling police officer William Hubner. Officer Hubner testified to the statement initially taken from the defendant following his arrest. That first statement was consistent with the one the defendant later gave to the assistant State's Attorney, and it contradicted the defendant's claim that the shooting of Officer Dawson was accidental.

Following the close of evidence, the trial judge found the defendant guilty of the murder of Officer Dawson. The judge specifically found that the fatal shot was fired by the defendant, and that the defendant acted intentionally in shooting the officer. The judge also found the defendant guilty of the following offenses: the armed robbery of Officer Dawson, the attempted murder of Officer Stutzman, the aggravated kidnapping of Donald Hamburg and of Hamburg's grandson and nephew, the

armed robbery of Hamburg, and the attempted murder of Officer Gross. The judge noted that other counts against the defendant for the conduct involved here merged with those findings of guilt. The trial judge found the defendant not guilty of the attempted residential burglary of the Hodge residence; earlier, at the close of the State's evidence, the trial judge had directed a finding in the defendant's favor on a charge alleging the attempted residential burglary of the Ross home.

The matter then proceeded to a capital sentencing hearing. During the first stage of the hearing, the trial judge concluded that the defendant was eligible for the death penalty, finding that the defendant, born in November 1964, was over 18 years of age at the time of the murder and that the victim was a police officer killed in the line of duty (see Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(1) ("the murdered individual was a peace officer or fireman killed in the course of performing his official duties and the defendant knew or should have known that the murdered individual was a peace officer or fireman")). The trial judge specifically declined to find that the murder was committed in the course of another felony, an additional circumstance on which the State sought to base the first-stage, eligibility determination (see Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(6)).

During the second stage of the sentencing hearing, the State presented evidence that the defendant was convicted of burglary in 1985. For that offense the defendant was ordered to serve four years' conditional discharge, with the first six months in the Cook County department of corrections, and to pay restitution of $250. Completing the State's evidence in aggravation, the prosecutor asked the trial judge to take notice of the convictions entered in the present case.

In mitigation, the defendant presented favorable testimony from four witnesses. George Nance, a Ford

Heights police sergeant, testified that he had known the defendant, a resident of Ford Heights, for more than 12 years. Nance regarded the defendant as a son; he never knew the defendant to be violent or to be involved with street gangs. Wayne Davis, a friend of the defendant since grade school, similarly testified that the defendant was a peaceful person and was not involved in gang activities. Davis stated that he and the defendant attended the same church. Silretta Graves also testified as a mitigation witness. Graves, formerly a librarian in Ford Heights, knew the defendant from his employment at the community library for a period of five to six months during 1983. She stated that the defendant was a dependable worker and was pleasant and polite. Graves also stated that the defendant had befriended a troublesome child who was enrolled in activities at the library. The defendant's final mitigation witness was Georgia Selmon, who supervised the youth employment training program that had placed the defendant at the Ford Heights library. Selmon found the defendant to be reliable and conscientious, and she stated that she had never received any complaints regarding his behavior. Selmon had been favorably impressed with the defendant, and noted that he had re-enrolled in high school so that he would be eligible to participate in the employment training program. Selmon also recounted an incident when the defendant had walked to a training workshop in a blizzard.

Following closing argument, the trial judge permitted the defendant to make a statement in allocution. The defendant apologized to the surviving family members, expressed regret for the murder, and stated that the fatal shooting had been an accident. At the conclusion of the hearing, the trial judge sentenced the defendant to death for the murder conviction. With respect to the defendant's other convictions, the court later sentenced

the defendant to imprisonment of 30 years for the armed robbery of Officer Dawson, 30 years for the attempted murder of Officer Stutzman, 15 years for the aggravated kidnapping of Donald Hamburg and the two boys, 15 years for the armed robbery of Hamburg, and 30 years for the attempted murder of Officer Gross. The sentences were to run consecutively, except those imposed for the offenses involving Hamburg and his grandson and nephew, which were to run concurrently with each other.

## I. Trial Issues

The defendant's first argument concerns the posttrial fitness hearing conducted in the present case. The defendant contends that the trial judge's and defense attorneys' errors at the hearing denied him due process and deprived him of the effective assistance of counsel. The defendant's fitness hearing was conducted after trial, but before the capital sentencing hearing. In a supplemental motion for a new trial, defense counsel requested a fitness hearing on the ground that the defendant had been receiving psychotropic drugs during the time of the trial.

The principle is well established that "the conviction of an accused person while he is legally incompetent violates due process [citation]." (*Pate v. Robinson* (1966), 383 U.S. 375, 378, 15 L. Ed. 2d 815, 818, 86 S. Ct. 836, 838; see also *United States ex rel. Bilyew v. Franzen* (7th Cir. 1988), 842 F.2d 189, 192; *People v. Murphy* (1978), 72 Ill. 2d 421, 430.) As a matter of due process, the competency determination requires inquiry into whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against

him." *Dusky v. United States* (1960), 362 U.S. 402, 402, 4 L. Ed. 2d 824, 825, 80 S. Ct. 788, 789 (*per curiam*).

The fitness provisions found in the Code of Criminal Procedure of 1963 set forth a comprehensive statutory scheme designed to safeguard the constitutional rights of incompetent persons. (Ill. Rev. Stat. 1985, ch. 38, pars. 104—10 through 104—31.) Under the provisions, "A defendant who is receiving psychotropic drugs or other medications under medical direction is entitled to a hearing on the issue of his fitness while under medication." (Ill. Rev. Stat. 1985, ch. 38, par. 104—21(a).) Prior to a hearing, the court is to order the defendant to undergo a psychological examination. (Ill. Rev. Stat. 1985, ch. 38, par. 104—13(a).) Following the examination, the expert is to submit a written report of his findings to the court and to the parties. (Ill. Rev. Stat. 1985, ch. 38, par. 104—15(a).) The court must then conduct a hearing on the defendant's fitness. (Ill. Rev. Stat. 1985, ch. 38, par. 104—16(a).) At the hearing, the State bears the burdens of going forward with the evidence, and of establishing the defendant's fitness by a preponderance of the evidence. (Ill. Rev. Stat. 1985, ch. 38, par. 104—11(c).) A defendant will be deemed unfit "if, because of his mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense." Ill. Rev. Stat. 1985, ch. 38, par. 104—10.

In the present case, the defendant initially raised the fitness issue in a supplemental motion for a new trial, and a hearing on the question was conducted during the interval between the trial and the capital sentencing hearing. At the beginning of the fitness hearing, the defense presented a stipulation, agreed to by the State, that records of the Cermak Health Services division of the county jail showed that the defendant was receiving 30 milligrams of Mellaril, a psychotropic drug, every

morning during the period from February 7, 1987, through February 26, 1988, and 50 milligrams every night from February 7, 1987, until sometime in February 1988, when the nighttime dosage was increased to 100 milligrams. The defendant's trial was conducted from February 5 through February 10, 1988; the fitness hearing was held more than a month later, on March 14, 1988. We note that there is no contention here that the drug was being administered to the defendant against his will. See *Riggins v. Nevada* (1992), 504 U.S. 127, 118 L. Ed. 2d 479, 112 S. Ct. 1810.

After the stipulation was entered into evidence, the State presented the testimony of Dr. Robert A. Reifman, a physician, a board-certified psychiatrist, and the director of the Psychiatric Institute for the circuit court of Cook County. Dr. Reifman explained that earlier that day he had received copies of the defendant's medical records from the county jail, which showed that the defendant had been receiving Mellaril. Dr. Reifman explained that Mellaril is used in the jail for controlling inmates' anxiety, depression, and sleeplessness. Dr. Reifman testified that the records did not disclose why the defendant was first given Mellaril, but he said that someone at the jail told him orally that the defendant began receiving it on February 5, 1987, because the defendant was having trouble adjusting to jail. The defendant was claiming to be emotionally disturbed, but the jailers believed that the defendant was only malingering. The defendant was then given Mellaril in an effort to calm him down and to help him sleep. Dr. Reifman was also told that the jailers had disbelieved the defendant's claim that he was hearing voices.

Dr. Reifman further stated on direct examination that, in his opinion, administering the drug to the defendant would not have adversely affected his fitness to stand trial. In fact, Dr. Reifman believed that the

drug would have been beneficial to the defendant, if it had produced the desired effect of decreasing his anxiety. Dr. Reifman explained that Mellaril is one of several drugs customarily given to defendants to help render them fit for trial.

On cross-examination, defense counsel asked Dr. Reif-. man about possible effects of Mellaril on an individual. Dr. Reifman explained that if a person is anxious, irritable, or nervous, Mellaril will dull those emotions and make the person less anxious, irritable, or nervous. Dr. Reifman allowed that the drug may have a sedative effect and make a person drowsy, but said that drowsiness would not be expected after a year's use of the drug. In addition, Dr. Reifman stated that, at the dosage levels involved here, Mellaril would not affect the defendant's ability to communicate.

Following the conclusion of Dr. Reifman's testimony, neither the prosecution nor the defense wished to offer any further evidence. The trial judge then permitted the parties to present arguments on their respective positions. Arguing first, defense counsel asserted that Mellaril would have produced some effects on the defendant. Counsel pointed out that the defendant, during his testimony at trial, was unable to identify certain items or scenes depicted in several photographic exhibits, including a plat or map of the area where Officer Dawson was shot, and the interior of Larry Strickland's car.

In response, the prosecution cited Dr. Reifman's testimony that Mellaril, in the dosage levels used here, would have enhanced the defendant's fitness. The prosecutor also noted that the defendant had testified for more than two hours during trial, and the prosecutor stated that the defendant was articulate and did not appear to be drugged.

At the conclusion of the hearing, the trial judge found the defendant fit. The trial judge explained his finding as follows:

"On the point of fitness of the Defendant, the Court has had the unique advantage of hearing Tyrone Strickland testify. I have heard his responses to the questions. I had a chance to observe him, which frequently I do not where the Defendant [does not] testif[y].

Under all the attendant circumstances, in light of the testimony of Dr. Reifman as to the use and purpose of the medication, based upon those factors, and in my own personal observation of the Defendant, I will respectfully deny your motion for new trial based upon his unfitness during the course of the trial because of the medication.

I will find he was, in fact, fit and that the medication assisted him in his ability to be fit for the purpose of trial."

The defendant now raises four specific objections regarding the fitness hearing in the present case. The defendant contends that the trial judge erred in failing to order a psychological examination prior to the hearing, improperly shifted to the defense the burden of persuasion on the fitness issue, and erred in relying on Dr. Reifman's testimony and on his own observations of the defendant's demeanor at trial.

The State acknowledges that the fitness hearing conducted in the present case did not conform in all respects to the statutory requirements. The State contends, however, that the determination of fitness reached by the trial judge was accurate and therefore may be upheld, notwithstanding the procedural deficiencies in the hearing. In addition, the State argues that the trial judge properly relied on Dr. Reifman's testimony, and on his own observations of the defendant's demeanor.

Although defense counsel raised the question of the defendant's fitness and sought a hearing on the subject, counsel made no objection to the court's failure to order

the defendant to undergo an examination prior to the fitness hearing, or to the court's willingness to permit the defense to proceed first in presenting evidence and argument at the hearing. In addition, counsel did not object to Dr. Reifman's references to the hearsay information he received from the county jailers, and counsel did not ask the judge to disregard that information or to ignore his own perceptions regarding the defendant's trial testimony. The State thus argues that the defendant has waived these objections to the fitness hearing. The defendant responds that his alleged unfitness for trial precludes any waiver argument and that, in any event, defense counsel was ineffective for failing to insist on compliance with the statutorily mandated procedures.

In support of the contention that he could not have waived these objections, the defendant relies on the following statement in *Pate v. Robinson* (1966), 383 U.S. 375, 15 L. Ed. 2d 815, 86 S. Ct. 836:

> "The State insists that Robinson deliberately waived the defense of his competence to stand trial by failing to demand a sanity hearing as provided by Illinois law. But it is contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently 'waive' his right to have the court determine his capacity to stand trial." (*Pate*, 383 U.S. at 384, 15 L. Ed. 2d at 821, 86 S. Ct. at 841.)

Accordingly, the defendant argues here that he could not have waived his rights to have the issue of his fitness determined in accordance with the requirements of the statute. Unlike defense counsel in *Pate*, however, counsel in the case at bar did raise the question of the defendant's fitness, and a hearing was then held on the matter. The present defendant's objections pertain not to the failure of the court to hold a fitness hearing, but rather to the procedures used at the hearing. Thus, we believe that the present objections to the hearing are best re-

solved as matters pertaining to the effective assistance of counsel.

The relevant standard for judging the performance of counsel is found in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052. (See *People v. Albanese* (1984), 104 Ill. 2d 504, 526-27 (adopting standard).) To prevail on an ineffective-assistance claim, a defendant must establish that counsel's performance was deficient. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." (*Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.) The defendant must also establish that he was prejudiced as a result of counsel's deficient performance. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." (*Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.) If the conclusion is reached that the defendant did not suffer prejudice as a consequence of counsel's actions, then there is no need to determine separately whether counsel's performance was in fact deficient. *Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.

In the present case, we conclude that the defendant has not shown that the trial court's failure to follow more closely the requirements of the fitness provisions deprived him of an accurate fitness determination. In his first objection to the manner in which the proceedings were conducted, the defendant argues that the trial judge committed reversible error in failing to order him to undergo an examination prior to the fitness hearing, as required by section 104—13(a) (Ill. Rev. Stat. 1985, ch. 38, par. 104—13(a) ("When the issue of fitness involves the defendant's mental condition, the court shall order an examination of the defendant by one or more

licensed physicians, clinical psychologists, or psychiatrists chosen by the court")). The defendant has not shown, however, what additional information would have assisted the trial judge in making the fitness determination in this case. Dr. Reifman testified that Mellaril, in the dosage levels administered to the defendant here, would have helped the defendant, enhancing his fitness for trial. In addition, it appears that the defendant had discontinued using Mellaril the previous month, so a subsequent examination would have been of reduced value to the court in determining the defendant's fitness at the time of trial.

The defendant next argues that the court followed procedures that improperly shifted to the defense the burden of establishing his unfitness for trial. The defendant notes that defense counsel presented his evidence first and argued first, a sequence indicating that the defense bore the burden of persuasion at the hearing. We note that the statute clearly places that burden on the State, consistent with case law on the subject. See Ill. Rev. Stat. 1985, ch. 38, par. 104—11(c); *People v. McCullum* (1977), 66 Ill. 2d 306, 312-14; *People v. Bender* (1960), 20 Ill. 2d 45, 53-54.

We believe that any error in this regard was harmless. There was no evidence at the hearing to indicate that the defendant was other than fit. The only evidence the defendant can muster in support of his contention that he was unfit is the mere fact that he was receiving Mellaril before and during trial, and his alleged difficulty in identifying scenes depicted in certain exhibits used at trial. Yet the testimony at the fitness hearing indicated that Mellaril, in the dosage levels used here, would have enhanced, rather than compromised, the defendant's fitness. On this record, we cannot say that the procedures followed by the trial court, which the defendant believes

transferred to the defense the burden of persuasion, had any effect on the outcome of the hearing.

The defendant also argues that the trial judge erred in relying on Dr. Reifman's testimony because the doctor's opinion rested on unreliable hearsay evidence gathered from employees of the county jail. We do not agree. A review of the transcript shows that Dr. Reifman did not base his opinion on the oral information he received from the jailers. Dr. Reifman offered the information by way of explaining why the defendant was initially given Mellaril; he did not purport to rely on it in making his own assessment of the drug's effects on the defendant.

Finally, the defendant contends that the trial judge erred in basing his ruling in part on his own observations of the defendant's demeanor during trial. We do not agree that the trial judge erred in doing so. In argument at the fitness hearing, defense counsel directed the judge's attention to the defendant's trial testimony, and his supposed difficulty in identifying certain photographic exhibits used at the trial. The defendant cannot now complain that the trial judge undertook the inquiry that defense counsel requested. Moreover, we do not believe that a judge is required to close his eyes to what occurs in his own courtroom. To be sure, lay observation is not a substitute for expert testimony. But a judge need not entirely ignore his own observations of the defendant, particularly when, as here, the defendant has taken the witness stand and testified at trial. The fitness determination requires an evaluation of the capacity of the accused to comprehend the proceedings and to assist in the presentation of his defense. (See Ill. Rev. Stat. 1985, ch. 38, par. 104—10.) We do not believe that a trial judge is required to disregard completely his own observations of the defendant's ability to perform those functions.

The defendant next argues that the trial judge erred in accepting the defendant's jury waivers for both trial and sentencing. The defendant contends that the waivers were the result of his fears for his safety in the Cook County jail, where he was incarcerated during the circuit court proceedings in this case.

The question whether the defendant would elect to be tried or sentenced by a jury came up a number of times during the proceedings below. The first discussion occurred a year before trial, on February 5, 1987, when the court was entertaining various pretrial motions. In a brief colloquy, the defendant initially stated that he would choose a jury trial but later stated that he had not yet reached a decision. At that time, the trial judge granted a defense motion to prohibit death qualifying prospective jurors prior to trial.

The next discussion occurred at a pretrial hearing on January 4, 1988. The defendant at that time stated that he wished to conclude the case as quickly as possible, that he understood that a bench trial was faster than a jury trial, and that he therefore wanted to choose a bench trial. The trial judge said that the trial in this matter would begin on February 5, 1988. The defendant then stated that he had been having problems at the county jail and that he was on a 23-hour-a-day lockup, apparently at his own request. The judge said that the trial would begin either on February 5 or on February 8, 1988, regardless of what form of trial the defendant eventually chose.

On January 25, 1988, the defendant entered his jury waiver for purposes of trial. Defense counsel stated that he had discussed the matter with the defendant and explained to him the differences between a bench trial and a jury trial. Counsel then tendered to the court a signed jury waiver. The trial judge separately admonished the

defendant regarding his right to a jury trial. The following colloquy then ensued:

"Q. Do you have any questions now about the procedure in the death penalty case?

A. No, sir.

Q. You discussed all this with your Counsel[,] Mr. Sarley?

A. Yes.

Q. Do you have any questions at all I can answer?

A. No, sir.

Q. You understand you are entitled to a Jury for the substantive hearing as well? You've discussed this part as well with your Counsel?

A. No, not as of yet.

THE COURT: I meant the part about whether or not you're guilty beyond a reasonable doubt on the charge of murder.

MR. SARLEY: The charge.

A. Oh, yes.

THE COURT: For trial but you are entitled to Jury and the trial [sic] you have discussed with Mr. Sarley?

A. Yes.

Q. Is it your wish to be tried by the Jury or Court?

A. By the Court.

Q. Leave is granted to file the jury waiver. And is it waived freely and voluntarily?

A. Yes, sir.

Q. Were any promises made to you as to what would occur in the event you give up your right to trial by jury?

A. No, sir.

Q. Leave granted to file the Jury waiver. The Court finds that the Defendant knowingly and intelligently, freely and voluntarily has waived his right to trial by Jury.

I would reset it for February 5th for purposes of trial."

Defense counsel then brought up one additional matter, stating that the defendant wanted to be transferred to a more secure section of the county jail because of the

problems he was experiencing with other inmates. The judge responded that he was not able to do anything about the situation.

The defendant's bench trial began as scheduled on February 5, 1988, and ended on February 10. After the trial concluded, the judge advised the defendant of his statutory right to a jury for purposes of the death penalty hearing. The judge described the role of the jury at the sentencing hearing, and mentioned that the favorable vote of a single juror at either stage of the hearing would result in a sentence other than death. The judge did not have the defendant decide at that time, however, whether to elect a jury.

A week later, on February 17, 1988, the defendant formally waived his right to a jury for the sentencing hearing. As he had the previous week, the trial judge again described the jury's role at sentencing. The judge also repeated his earlier discussion of the rule that a single juror's favorable vote at either stage would preclude imposition of the death penalty. The following colloquy then ensued:

"THE COURT: *** Do you understand, sir, your right to a jury for the purpose of this hearing?

THE DEFENDANT: Yes, sir.

THE COURT: Have you discussed this with your counsel, Mr. Sarley?

THE DEFENDANT: Yes, I have.

THE COURT: Any questions?

THE DEFENDANT: Yes, I am just kind of confused about the finding of the felony in process [sic].

THE COURT: It's not necessary that the Court make any specific finding when there are multiple counts of murder, the jury nor myself nor would I indicate which of those several counts I will find you guilty of, they're all charging you with murder of one victim, and I found you guilty of that charge and I am leaving it for the trier of

fact to decide whether or not felony murder is an aggravating factor. Any other questions?

THE DEFENDANT: No, sir, I have decided not to take a jury.

THE COURT: You wish to waive your jury for the purposes of this hearing?

THE DEFENDANT: Yes.

THE COURT: All right, you understand regardless of what the finding is on the felony murder, there is still the other predicate, aggravation, and that is the fact that it was a police officer in the line of duty.

THE DEFENDANT: Yes, I realize it.

THE COURT: You realize again that if you or your counsel were to, simply one jury [*sic*] not to pose [*sic*] the death penalty, that's sufficient to not impose?

THE DEFENDANT: Yes.

THE COURT: If you place the fact-finding process in my hands, I will base [*sic*] the decision.

THE DEFENDANT: Yes.

THE COURT: Understanding that then, I will then ask you to sign the jury waiver for the purpose of the death penalty hearing. Are you giving up that right freely and voluntarily[,] Mr. Tyrone Strickland?

THE DEFENDANT: Yes.

THE COURT: Any promises made to you, if you give up your right to a trial by jury?

THE DEFENDANT: Yes.

THE COURT: There were promises made to you?

THE DEFENDANT: No, sir.

THE COURT: I ask that you sign the jury waiver.

MR. SARLEY: Just one moment.

THE COURT: Sure.

MR. SARLEY: Your Honor, I tender a signed jury waiver at this point.

THE COURT: Before accepting the jury waiver, Mr. Tyrone Strickland, this is what you want to do?

THE DEFENDANT: Yes.

THE COURT: You are doing so freely and voluntarily?

THE DEFENDANT: Yes."

The matter was then continued.

The defendant's sentencing hearing was conducted a month later, on March 14, 1988. Prior to the commencement of the hearing, the trial judge asked the defendant whether he wished to adhere to his earlier decision to waive a jury for purposes of the hearing. The judge once again described the jury's role at sentencing. The defendant persisted in his decision.

The defendant's right to a jury at the guilt phase of the proceedings is guaranteed by both the Federal and State Constitutions (U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, §§8, 13); his right to a jury at the capital sentencing hearing is wholly statutory (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(d); *People v. Maxwell* (1992), 148 Ill. 2d 116, 142; *People v. Nitz* (1991), 143 Ill. 2d 82, 129; *People v. Ruiz* (1989), 132 Ill. 2d 1, 20; *People v. Erickson* (1987), 117 Ill. 2d 271, 289). Despite their different origins, however, waiver of either jury right must be knowing, intelligent, and voluntary. (*People v. Buggs* (1986), 112 Ill. 2d 284, 292-93; *People v. Albanese* (1984), 104 Ill. 2d 504, 534-36; *People v. Rivera* (1966), 34 Ill. 2d 575, 577-78.) In this regard, there is no fixed formula that must be recited by the court prior to receiving a defendant's valid jury waiver, whether at trial (*People v. Smith* (1985), 106 Ill. 2d 327, 334; *People v. Frey* (1984), 103 Ill. 2d 327, 332) or at a capital sentencing hearing (*Buggs*, 112 Ill. 2d at 292; *Albanese*, 104 Ill. 2d at 535-36).

We believe that the trial judge's admonitions in the present case were sufficient to ensure that both of the defendant's jury waivers were knowing, intelligent, and voluntary. The record shows that on each occasion the defendant stated that he had conferred with counsel regarding the waiver. In addition, the trial judge questioned the defendant thoroughly prior to each of the two

waivers, ensuring that the defendant understood the nature of the constitutional and statutory rights he was surrendering.

The defendant contends, however, that fears for his personal safety while an inmate of the county jail spurred his decisions to waive trial and sentencing juries. The defendant maintains that remarks and circumstances attending both waivers should have made clear to the trial judge that the underlying reason for the waivers was the defendant's desire to expedite the proceedings and hence reduce the length of his stay in jail. In support of this argument, the defendant refers to remarks made at the January 4, 1988, hearing. At that time, the defendant explained that he wanted a bench trial rather than a jury trial because he understood that the former was faster. Later in the hearing, the defendant referred to problems he was having with other inmates in the county jail. The defendant also notes that at the hearing on January 25, 1988, after he waived the jury for trial, defense counsel asked whether the court could intercede on the defendant's behalf and have the defendant transferred to a more secure setting at the jail.

We recently addressed a similar contention in *People v. St. Pierre* (1992), 146 Ill. 2d 494, 508-11. The defendant in that case argued that his waiver of a capital sentencing jury was involuntary "because it was motivated by the dangerous conditions in which he was confined at the Cook County jail." (*St. Pierre*, 146 Ill. 2d at 508.) The record disclosed, however, that the defendant had consulted with his attorney before waiving the jury, that the trial judge thoroughly admonished the defendant concerning the rights he was giving up, and that the defendant understood the consequences of his decision. In light of these circumstances, we concluded that the jury waiver was knowingly and intelligently made. In ad-

dition, we noted that the defendant had failed "to allege any specific instance of abuse, either physical or mental, or coercion which would have caused him to waive a jury for sentencing. Thus, we find that defendant has failed to demonstrate a necessary nexus between the alleged coercive conditions at the jail and his waiver of jury for sentencing." *St. Pierre*, 146 Ill. 2d at 511.

We believe the same conclusion must be reached in the case at bar. The defendant has failed to show any connection between his alleged fears for his personal safety and his decision to waive trial and sentencing juries. The extensive inquiries made by the trial judge establish that the defendant's waivers were knowing, intelligent, and voluntary. There is nothing in the record to indicate otherwise, and we therefore decline to upset either waiver.

The defendant next argues that the State failed to prove, beyond a reasonable doubt, his guilt for Officer Dawson's murder. The defendant confessed to shooting Officer Dawson, and evidence of those statements was introduced at trial. In addition, the defendant testified on his behalf at trial, acknowledging that he shot the officer but insisting that the act was accidental. Nonetheless, the defendant now contends that he was not proved guilty of the offense. In support of this argument, the defendant cites the testimony of witnesses whose descriptions of the occurrence supported the theory that the defendant's brother, Larry Strickland, was the gunman.

At trial, several prosecution witnesses provided testimony that supports the defendant's contention. These witnesses, including Christine Hodge and Rex Orton, Jr., another resident of the neighborhood where the murder occurred, testified that the shooting was committed by a short man in a tan or gold coat who was wearing a bandanna. According to the evidence, that person would

have been Larry Strickland; the defendant was larger than his brother and was wearing a dark coat and a dark-colored stocking cap. Another prosecution witness, Robert Neil, an off-duty Des Plaines police officer, also gave testimony supporting the defense theory that Larry was the gunman. Prior to the shooting, Neil saw Dawson struggling with a man wearing a bandanna and a light-colored coat; they were out of Neil's line of sight when the shot was fired.

In further support of that theory, the defense presented the testimony of Carol Dalton. On the evening of the murder, Carol Dalton was driving with a friend and looking for her daughter when she noticed Officer Dawson's marked police car. Believing that her daughter might be with the officer, Dalton had her friend follow the squad car. From a distance of 170 to 200 feet, Dalton saw Dawson's encounter with the two offenders. According to Dalton's testimony, one of the men disappeared behind a building while the officer struggled with the other man, who was wearing a gold or yellow jacket; Dalton heard a gunshot and then saw the officer fall to the ground. As we have stated, the person in the yellow jacket would have been Larry Strickland, and not the defendant.

In further support of this contention, the defendant notes that Donald Hamburg, whose car the defendant and Larry commandeered in Buffalo Grove, testified that during the trip to Chicago, one of the offenders, whom Hamburg later identified as Larry, asked the other offender, apparently the defendant, whether the defendant had seen what Larry had done to the slain officer. Finally, the defendant suggests that his confession was the product of psychological coercion, noting that this was the unsuccessful ground on which he had sought its suppression in this case.

The same argument was made to the trial judge, who specifically rejected the defense theory that the defendant did not fire the fatal shot. The judge, at the close of evidence, found that it was the defendant, and not Larry, who shot and killed the officer, and that the defendant's act was intentional rather than accidental.

Our role in reviewing the trial court's finding on this question of fact is, of course, limited. The standards governing our review are familiar:

> "A criminal conviction will not be set aside on review unless the evidence is so improbable or unsatisfactory that there remains a reasonable doubt of the defendant's guilt. (*People v. Collins* (1985), 106 Ill. 2d 237, 261; *People v. Williams* (1982), 93 Ill. 2d 309, 315; *People v. Vriner* (1978), 74 Ill. 2d 329, 342.) It is not our function to retry a defendant when considering a challenge to the sufficiency of the evidence of his guilt. (*Collins*, 106 Ill. 2d at 261.) Rather, determinations of the credibility of witnesses, the weight to be given to their testimony, and the reasonable inferences to be drawn from the evidence are responsibilities of the trier of fact. (*People v. Brisbon* (1985), 106 Ill. 2d 342, 360.) On review, ' "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *** "[O]nce a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." (Emphasis in original.)' *Collins*, 106 Ill. 2d at 261, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789." *People v. Jimerson* (1989), 127 Ill. 2d 12, 43-44.

Applying these principles to the case at bar, we are unable to say that the trial judge's factual finding cannot stand. The defendant confessed to law enforcement officers that he had shot and killed Officer Dawson. At trial,

moreover, the defendant testified that it was he who fired the shot that killed the officer. This evidence is sufficient to sustain the court's finding, notwithstanding the contrary testimony of several witnesses who believed that Officer Dawson was shot by the offender who matched Larry Strickland's description. The witnesses' descriptions of the occurrence were not entirely consistent with one another. In addition, because the shooting occurred while the officer was struggling with Larry, the witnesses may simply have assumed that Larry was the gunman. Moreover, the offense occurred around 7:30 on a November evening, and the Stricklands were strangers to the neighborhood. The witnesses' identification of the gunman may be attributed to the nighttime hour, and to their unfamiliarity with the two offenders. Finally, we note, with regard to Hamburg's testimony about Larry's comment during the drive to Chicago, that Larry did not say what he had done to the officer.

In a related contention, the defendant argues that if his guilt for the murder rests on his inculpatory statements, then the conviction is infirm because there is no evidence to corroborate his admissions that he was the gunman. The premise for this argument apparently is the rule that proof of the *corpus delicti* may not be established by means of a defendant's extrajudicial confessions alone, but must instead find corroboration in evidence independent of those statements. (*People v. Furby* (1990), 138 Ill. 2d 434, 445-47; *People v. Dalton* (1982), 91 Ill. 2d 22, 29-30.) There was no violation of the rule here.

The *corpus delicti* comprises the occurrence of the injury or loss and its causation by criminal conduct; "the identity of the accused as the offender, the ultimate issue, is not considered part of the *corpus delicti.*" (*Furby*, 138 Ill. 2d at 446.) Accordingly, there is no requirement that the defendant's identity as the offender

be corroborated by evidence apart from his own extrajudicial statements; in the present case there was, however, ample evidence apart from the defendant's extrajudicial statements corroborating those matters to which the rule properly applies, and the defendant raises no challenge to the evidence in that regard.

In another challenge to the sufficiency of the prosecution's evidence, the defendant argues that the State failed to prove beyond a reasonable doubt that he was guilty of the armed robbery of Officer Dawson. That conviction was based on the defendant's taking the officer's gun after the shooting. The defendant maintains that the conviction must be overturned because the evidence does not establish that he shot and killed the officer for the purpose of taking property of the victim.

Section 18—1(a) of the Criminal Code of 1961 defines the offense of robbery in the following terms:

> "A person commits robbery when he takes property from the person or presence of another by the use of force or by threatening the imminent use of force." (Ill. Rev. Stat. 1985, ch. 38, par. 18—1(a).)

Armed robbery is the commission of robbery while armed with a dangerous weapon. See Ill. Rev. Stat. 1985, ch. 38, par. 18—2(a).

Citing *People v. Tiller* (1982), 94 Ill. 2d 303, *People v. Pecina* (1985), 132 Ill. App. 3d 948, and *People v. Pack* (1976), 34 Ill. App. 3d 894, the defendant argues that the armed robbery conviction must be reversed because there is no evidence in the present case showing that the force exerted against Officer Dawson was intended or used as a means of taking the officer's gun. In *Tiller*, the defendant was convicted as an accomplice of murder and as a principal of armed robbery. The evidence showed that the defendant left the scene before the murder was committed, telling the principal not to harm the victim, and that he returned sometime later and then

took property belonging to the victim. This court reversed the armed robbery conviction, finding the absence of any connection between the force used to kill the victim and the eventual taking of her property. The *Tiller* court stated:

"Taking advantage of an existing threat, where that threat was not delivered to persuade the victim to release control of property, creates no additional danger of great bodily harm. [Citations.] It is not clear from the record what transpired in the cleaners, but there is no evidence to show that the force exerted against Miss Brown was for the purpose of depriving her of the mail truck or the mail in it. We conclude that the conviction for the armed robbery of Miss Brown must be reversed." (*Tiller*, 94 Ill. 2d at 316.)

One of the cases cited by *Tiller* in support of its result was *Pack*; a similar result was also reached in *Pecina*, another case cited by the present defendant.

We believe there was, in the present case, the necessary concurrence between the defendant's use of force and his taking of the victim's property. (See *People v. Ward* (1992), 154 Ill. 2d 272; *People v. Blake* (1991), 144 Ill. 2d 314; *People v. Williams* (1987), 118 Ill. 2d 407.) Addressing a similar challenge to a robbery conviction, this court has stated:

"The fact that the defendant [*sic*] had been reduced to a state of physical non-resistance before his money was taken does not relieve the crime of the quality constituting robbery. If, as the result of a quarrel, a fight occurs in which one of the parties is overcome, and the other then, without having formed the intention before the fight began, takes the money of the vanquished one, the offense committed is robbery." (*People v. Jordan* (1922), 303 Ill. 316, 319.)

Although *Jordan* was decided under former law, we do not believe that the language of the current statute compels a different result. Section 18—1 of the Criminal

Code requires that the taking be accomplished by force or the threat of force. Such was obviously the case here, regardless of whether the defendant had previously formulated an intent to take the slain officer's weapon or other property. See 2 W. LaFave & A. Scott, Substantive Criminal Law §8.11(e), at 452-54 (1986).

We do not, however, agree with the statement in *Tiller* that it was necessary to reverse the robbery conviction in that case because "there [was] no evidence to show that the force exerted against [the victim] was for the purpose of depriving her of [the property taken]." (*Tiller*, 94 Ill. 2d at 316.) That principle is not consistent with this court's earlier holding in *Jordan*, and unnecessarily restricts the operation of the robbery statute. This is not to say, however, that no concurrence between the force and the taking is required.

In a final challenge to the sufficiency of the evidence, the defendant contends that he was not proved guilty beyond a reasonable doubt of the armed robbery of Donald Hamburg. The property alleged to have been taken in that offense was Hamburg's automobile. The defendant contends that there was no evidence that he or his brother took the vehicle from Hamburg, for the owner remained in operation of the car throughout the time they were present. The State responds that the defendant and Larry effectively controlled the use of Hamburg's vehicle during the drive from Buffalo Grove to Chicago, and the State would conclude that the offenders were in constructive possession of the vehicle throughout that interval.

As we have noted, the offense of robbery requires proof that the accused took property from the person or presence of another by force or the threat of force. (See Ill. Rev. Stat. 1985, ch. 38, pars. 18—1, 18—2.) "[T]he taking by force or the threat of force is the gist of the offense" (Ill. Ann. Stat., ch. 38, par. 18—1, Committee

Comments, at 113 (Smith-Hurd Supp. 1992)), and the offense "is complete when force or threat of force causes the victim to part with possession or custody of property against his will" (*People v. Smith* (1980), 78 Ill. 2d 298, 303). We agree with the defendant that the evidence in this case was not sufficient to satisfy the taking element of the offense of armed robbery. There was no evidence that the property at issue—Hamburg's car—was ever taken from him. Although the Stricklands' actions certainly denied Hamburg a large measure of control over his vehicle and would have been sufficient to sustain a charge of intimidation (see Ill. Rev. Stat. 1985, ch. 38, par. 12—6), the automobile was never removed from Hamburg's actual possession. For these reasons, we conclude that the State failed to establish one of the elements of armed robbery, and the defendant's conviction for that offense must therefore be reversed.

In his final challenge to the guilt phase of the proceedings below, the defendant argues that the trial judge erred in failing to appoint new counsel to assist him in presenting a *pro se* motion challenging the effectiveness of trial counsel.

The defendant filed the *pro se* motion after the conclusion of the sentencing hearing. The trial judge declined to appoint different counsel to represent the defendant on the motion. The defendant now argues that the trial court conducted an inadequate inquiry in determining whether to appoint a new attorney to assist in the presentation of those claims.

In the proceedings below, the trial judge eventually denied the defendant's *pro se* motion without having appointed different counsel to represent the defendant. After several hearings, in which the trial judge considered the availability of other counsel to handle the defendant's *pro se* motion, the judge addressed the issues raised in the motion, and also gave defense counsel an

opportunity to respond to the defendant's allegations of ineffective assistance. Counsel declined to discuss specific details of his representation of the defendant on the ground that he would be breaching the confidentiality requirements if he did so. Counsel did say, however, that he believed he had acted in the defendant's best interests throughout the proceedings, and that he had "explored every avenue" in an effort to gain a not-guilty finding.

The trial judge denied the defendant's *pro se* motion. The judge noted that a number of the allegations concerned matters of trial strategy. In addition, the judge stated that the medical examiner's testimony regarding the direction of the fatal bullet would not have made a difference in the outcome of the case, given the circumstances in which the offense was committed. Noting that defense counsel had tried other cases before the court, the trial judge declared that the attorney had always acted professionally.

In *People v. Nitz* (1991), 143 Ill. 2d 82, 133-35, we held that new counsel is not automatically required in every case in which a defendant files a motion challenging the performance of his trial attorney. If the matters raised in the motion clearly lack merit or pertain to trial strategy, then the court may dispose of the motion without having appointed a new attorney to assist the defendant in the presentation of those claims. "If, however, the defendant's allegations of incompetence indicate that trial counsel neglected the defendant's case, the court should appoint new counsel to argue defendant's claims of ineffective assistance of counsel." (*Nitz*, 143 Ill. 2d at 134-35.) Before this court, the defendant cites three allegations of incompetence made in the *pro se* motion that, he contends, mandated the appointment of new counsel.

The defendant argued that counsel erred in failing to present an affirmative defense, in permitting a Wheeling police officer, William Hubner, to remain in the courtroom during the prosecution's case in chief, though he later testified in rebuttal, and in failing to call as a witness the medical examiner, Dr. Robert Stein, who performed the autopsy on the murder victim. The defendant renews these arguments here. We agree with the trial judge that the matters raised in the defendant's *pro se* motion did not warrant the appointment of new counsel.

The defendant in his *pro se* motion faulted trial counsel for failing to pursue an affirmative defense. The defendant has not specified what affirmative defense would have been available in this case, however. We note that defense counsel presented to the trial judge several different theories of the case, or "themes," as he termed them. In closing argument, defense counsel contended that the trial evidence in the case could support several different outcomes. First, counsel argued that the defendant's own testimony indicated that the shooting was accidental, and counsel thus stated that the defendant could be found either not guilty, or guilty only of involuntary manslaughter. Second, counsel argued that the defendant's post-arrest statements indicated that he shot the officer to help protect his brother. Counsel believed that this evidence would support a finding of voluntary manslaughter. Finally, counsel argued that the testimony of a number of witnesses at trial supported the defense theory that the murder was committed by the defendant's brother, and not by the defendant. The defendant has not suggested any further defenses that could have been interposed to the charges here. There is no claim here that counsel failed to interview alibi witnesses or otherwise investigate a defense to the charges against the defendant.

The defendant, in his *pro se* motion, also contended that trial counsel erred in permitting Officer William Hubner, of the Wheeling police department, to remain in the courtroom throughout the State's case in chief. Officer Hubner testified for the State as a rebuttal witness, and the defendant argues that the officer's testimony was aided by his exposure to the State's evidence.

At the beginning of the trial, the parties agreed that all witnesses would be excluded, with two exceptions: Officer Dawson's widow, who was to testify as a life-and-death witness, would be permitted to remain in the courtroom throughout the proceedings, and Officer William Hubner, who was accompanying Mrs. Dawson, would be permitted to remain in the courtroom during the State's case in chief. In rebuttal, Officer Hubner testified to the first statement given by the defendant to authorities following his arrest; this statement was consistent with the one previously introduced by the prosecution. Officer Hubner was not present during the defendant's presentation of evidence, however, and we do not believe that defense counsel can now be challenged for agreeing to permit the officer to remain in the courtroom, with Mrs. Dawson, during the State's case in chief.

Finally, the defendant argues that Dr. Stein's testimony on the path taken by the fatal bullet would have supported the defense theory that the shot was fired accidentally. Dr. Stein's findings, however, were already before the trial court—they were introduced into evidence by way of stipulation. The defendant does not theorize that Dr. Stein's testimony, had he been called as a witness, would have differed in any respect from his written findings.

Because the matters complained of clearly lack merit, or simply involve questions of trial strategy, we conclude that the trial judge did not err in failing to appoint coun-

sel to represent the defendant in connection with his *pro se* motion.

For the reasons stated, we reverse the defendant's conviction for the armed robbery of Donald Hamburg and affirm the defendant's remaining convictions. We consider next the challenges raised by the defendant to the sentences imposed in this case.

## II. Sentencing Issues

The defendant raises a number of challenges to the sentencing proceedings conducted in the present case. The defendant first argues that the trial judge erred in permitting the prosecutor to comment on evidence that the murder victim was survived by family members. The defendant contends that the prosecutor's remark violated decisional law of this court.

At the conclusion of the second stage of the sentencing hearing, the prosecutor made the following remarks in summation:

"MR. ERICKSON [Assistant State's Attorney]: *** When Tyrone Strickland killed Kenneth Dawson he killed a human being, a father, a family man.

MR. SARLEY [defense counsel]: Objection, your honor. I don't believe this is relevant in a sentencing hearing.

MR. ERICKSON: It is in the nature of a victim impact statement.

THE COURT: There is evidence in the record as to the status of the victim. I will let Counsel make comments."

Notwithstanding the trial judge's favorable ruling, the prosecutor did not make any additional remarks of that nature.

The defendant contends that the prosecutor's comment violated decisions of this court disapproving of evidence or argument on surviving family members. (See,

*e.g., People v. Bernette* (1964), 30 Ill. 2d 359, 370-73; *People v. Gregory* (1961), 22 Ill. 2d 601, 605-06; *People v. Dukes* (1957), 12 Ill. 2d 334, 340.) We note that the defendant initially argued that the comment complained of also violated Federal constitutional law, as announced in *Booth v. Maryland* (1987), 482 U.S. 496, 96 L. Ed. 2d 440, 107 S. Ct. 2529. In his reply brief, the defendant correctly acknowledges the intervening decision in *Payne v. Tennessee* (1991), 501 U.S. 808, 115 L. Ed. 2d 720, 111 S. Ct. 2597, which overruled *Booth,* and now bases the present contention entirely on State law.

Since oral argument in this case, we have determined that State law on this subject should not differ from Federal law. (See *People v. Howard* (1991), 147 Ill. 2d 103, 155-58.) Such evidence may, therefore, be considered by the sentencing authority in determining whether to impose the death penalty in a particular case. Accordingly, we find no error in the prosecutor's summation at the sentencing hearing.

The defendant next argues that if either one of his convictions for armed robbery is reversed, then his death sentence must be vacated and the cause remanded for a new sentencing hearing. The defendant believes that the trial judge, in deciding to impose the death penalty, specifically relied on the evidence of the series of offenses committed by the defendant after the officer was killed. Although we have held that the defendant's conviction for the armed robbery of Donald Hamburg must be reversed, we do not agree with the defendant that a new sentencing hearing is therefore necessary.

The defendant's conviction for the armed robbery of Donald Hamburg must be reversed not for a failure of proof tying the defendant to the underlying conduct on which the charge is based, but rather for lack of evidence of one of the elements of the crime alleged. The defendant's conduct was no less reprehensible, however.

In addition, we note that the trial judge, in deciding whether to sentence the defendant to death, did not attach any weight to the defendant's conviction for that offense, as distinguished from the conduct on which the conviction was based. The trial judge remained free to consider evidence of the defendant's misconduct, whether or not those specific acts formed the basis of a valid conviction. See *People v. Orange* (1988), 121 Ill. 2d 364, 391-92.

The defendant insists, however, that he would not have received the death penalty if he had not been convicted of the armed robbery of Donald Hamburg. In support of this contention, the defendant cites the following comments made by the trial judge at the conclusion of the sentencing hearing:

> "THE COURT: *** So the ten or twenty or thirty seconds of which Counsel speaks, severely altered your life and took the life of Officer Dawson. He had every right to be alive and well today as you and I sit here but he is not. If that were the case, I would not impose the death penalty. It would stop there."

The trial judge then reviewed the defendant's conduct after the officer's shooting—the defendant's escape from the area, the shots fired at Officer Stutzman, the ride to Chicago, in which Donald Hamburg and Hamburg's grandson and nephew were held at gunpoint, and, finally, the shot fired at Officer Gross. The trial judge then stated:

> "Having found that in fact you are eligible for the death penalty in the light of the conduct following the shoot out which caused the death or the shooting I should say, that caused the death of Kenneth Dawson, I would find it under all attendant circumstances, there are no mitigating circumstances sufficient to preclude the imposition of the death penalty."

We find no evidence to support the defendant's argument that the trial judge would not have imposed the death penalty if he had not found the defendant guilty of the armed robbery of Donald Hamburg. Rather, the trial judge's comments indicate that, in determining whether to impose the death sentence, he considered the various acts committed by the defendant following the officer's shooting. It is one thing to say that the trial judge would not have sentenced the defendant to death if the defendant had not been found guilty of the Hamburg armed robbery, and quite a different thing to say that the judge would not have sentenced the defendant to death if the defendant had not committed any additional offenses after Officer Dawson was shot. We do not interpret the trial judge's remarks as suggesting that the judge would have imposed a sentence other than death if the defendant had not been found guilty of the armed robbery of Hamburg.

Our review of the trial judge's comments at the sentencing hearing satisfies us that the judge did not attach any particular weight at all to the fact that he had found the defendant guilty of the armed robbery of Donald Hamburg. At sentencing, the judge thoroughly reviewed the defendant's criminal conduct in this case but did not mention the conviction for the armed robbery of Hamburg. Whether the defendant was charged with and convicted of armed robbery, of intimidation, or of no separate offense at all for his role in commandeering Hamburg's car, it is clear that the defendant's sentence for the officer's murder would have remained the same.

The defendant argues that death is an excessive sentence in the present case. In his brief before this court, the defendant divides the argument into two parts, one directed at a conviction on an accountability theory, in which he argues that the sentence is inappropriate under

*Tison v. Arizona* (1987), 481 U.S. 137, 95 L. Ed. 2d 127, 107 S. Ct. 1676, and the other based on his guilt as a principal. We have already rejected defendant's challenge to his conviction on reasonable doubt grounds, and in so doing we found no reason to disturb the trial judge's express determination that the defendant was the gunman. Accordingly, we limit our discussion here to the defendant's challenge to his sentence as a principal. We do not mean to suggest, however, that our result would be different if the defendant had instead been found guilty on an accountability theory.

The defendant argues that the death penalty is an excessive sentence in the present case in light of his limited criminal record and the mitigating evidence he presented at the sentencing hearing. We do not agree.

Imposition of the death penalty constitutionally requires an individualized consideration of the circumstances and character of the offender and the offense. (*Eddings v. Oklahoma* (1982), 455 U.S. 104, 110-12, 71 L. Ed. 2d 1, 8-9, 102 S. Ct. 869, 874-75.) "In deciding whether imposition of that sentence in a particular case is excessive, we will consider 'whether the circumstances of the crime and the character of the defendant are such that the deterrent and retributive functions of the ultimate sanction will be served by imposing the death penalty.' " *People v. Tye* (1990), 141 Ill. 2d 1, 29, quoting *People v. Johnson* (1989), 128 Ill. 2d 253, 280.

We do not believe that the death sentence is excessive in the case at bar. The evidence presented at trial establishes that the defendant shot and killed Officer Dawson and then committed a series of additional offenses following the murder. While fleeing from the scene, the defendant shot at Officer Stutzman; for this, the defendant was convicted of attempted murder. The Stricklands then went to Buffalo Grove, where they forced Donald Hamburg, at gunpoint, to drive them from the area.

Also present in the car were Hamburg's young grandson and nephew. For these acts, the defendant was convicted of the aggravated kidnapping of each of the three victims. In downtown Chicago, the Strickland brothers fled from the vehicle, after Hamburg managed to attract the attention of a nearby police officer, Edward Gross. At that time, the defendant fired a shot at Officer Gross; for this act, the defendant was convicted of a second charge of attempted murder.

The defendant's prior record was relatively brief, consisting of a conviction for burglary. With the offenses committed in this case, however, the defendant compiled a substantial criminal record, which involved six different victims. He murdered one person, attempted to murder two persons, and was guilty of the aggravated kidnapping of three other persons.

Unlike the mitigating evidence in prior cases in which this court has found a sentence of death to be excessive, the mitigating evidence in the case at bar did not suggest that the defendant's offenses were triggered by or resulted from substantial extenuating circumstances. (See *People v. Leger* (1992), 149 Ill. 2d 355; *People v. Johnson* (1989), 128 Ill. 2d 253; *People v. Buggs* (1986), 112 Ill. 2d 284; *People v. Carlson* (1980), 79 Ill. 2d 564; see also *People v. Gleckler* (1980), 82 Ill. 2d 145 (vacating death sentence as excessive; also finding death sentence to be disproportionate to codefendant's sentence).) For these reasons, we do not believe that death is an excessive sentence here.

The defendant makes the further contention that his sentence of death is disproportionate to the term of life imprisonment received by his brother, Larry, for the same offense of murder. The defendant maintains that his involvement in the present crimes and his past criminal record, viewed in combination, are not substantially different from Larry's own criminal history, and that the

death sentence imposed in the present case must therefore be vacated.

Comparative proportionality review—a comparison of the sentence imposed on a particular defendant with the sentences imposed on other persons convicted of the same offense—is not required in capital cases by the Federal Constitution (*Pulley v. Harris* (1984), 465 U.S. 37, 79 L. Ed. 2d 29, 104 S. Ct. 871) and is not an aspect of our own State's death penalty statute (*People v. Johnson* (1992), 149 Ill. 2d 118, 158; *People v. King* (1986), 109 Ill. 2d 514, 551; *People v. Kubat* (1983), 94 Ill. 2d 437, 502-04; *People v. Brownell* (1980), 79 Ill. 2d 508, 541-44). "Nonetheless, this court has previously considered whether a sentence of death in a particular case is disproportionately harsh in comparison with the less severe sanction imposed on a codefendant convicted of the same crime." (*People v. Jimerson* (1989), 127 Ill. 2d 12, 54, citing *People v. Ashford* (1988), 121 Ill. 2d 55, 82-90; *People v. Erickson* (1987), 117 Ill. 2d 271, 302-03; *People v. Szabo* (1983), 94 Ill. 2d 327, 351-53; *People v. Gleckler* (1980), 82 Ill. 2d 145, 167-69, 171. Accord *People v. St. Pierre* (1992), 146 Ill. 2d 494, 512-14; *People v. Steidl* (1991), 142 Ill. 2d 204, 246; *People v. Bean* (1990), 137 Ill. 2d 65, 134-36.) It is this limited form of proportionality review that the defendant asks us to undertake in the present appeal.

The defendant, comparing his role in the present offenses and his past criminal record to the role and record of his brother, maintains that his relatively greater culpability in the present case is counterbalanced by his relatively shorter criminal record. The defendant argues that these circumstances, when viewed in combination, demonstrate that he is no more deserving of the death penalty than is his brother. We do not agree.

Tyrone and Larry were sentenced by the same judge, and the record in the present appeal has been supple-

mented with the transcript of the sentencing hearing in Larry's case. Larry was tried, convicted, and sentenced after the conclusion of the proceedings in the case at bar. Larry was found eligible for the death penalty on two separate grounds: that the present victim was a police officer killed in the line of duty, and that Larry had previously been convicted of murder (see Ill. Rev. Stat. 1985, ch. 38, pars. 9—1(b)(1), (b)(3)). The aggravating evidence introduced at Larry's sentencing hearing showed that Larry was convicted of murder in 1975, of unlawful use of weapons in 1982, and of obstructing a police officer in 1984. In addition, Larry was found guilty of 19 disciplinary violations while in prison from March 1982 to April 1984, and of 23 disciplinary violations while in jail awaiting trial for the murder of Officer Dawson. At the conclusion of Larry's sentencing hearing, the trial judge explained why he was not sentencing Larry to death. The judge found that the present defendant, as the gunman, was the more culpable of the two. The judge observed that Larry had tossed away the gun when he first saw Officer Dawson, but that the defendant retrieved the weapon and then intentionally shot the officer.

As the trial judge noted, the different sentences received by the defendant and Larry are warranted by their different levels of culpability for the present offenses. (See *People v. Ashford* (1988), 121 Ill. 2d 55, 88-89.) The present defendant was the gunman, making use of the weapon that Larry had discarded. The defendant's greater sentence may be upheld even though his codefendant had the more extensive criminal record. (See *Ashford*, 121 Ill. 2d at 89.) Recognizing the gravity of the defendant's crimes, we have already rejected the defendant's argument that his sentence of death is not commensurate with his offenses or his individual circumstances. Similarly, we cannot say that the sentence of

life imprisonment imposed on the codefendant renders the defendant's sentence of death comparatively disproportionate.

The defendant also raises two challenges to the facial validity of the Illinois death penalty statute (Ill. Rev. Stat. 1985, ch. 38, par. 9—1). As we explain below, both of these arguments have previously been rejected, and we see no reason to reach a different result here.

The defendant first argues that the statute places on the defense a burden of proof that effectively bars meaningful consideration of mitigating evidence. Under the statute, the sentencing authority, having found the defendant eligible for the death penalty, is to impose that sentence unless the evidence in mitigation is sufficient to preclude it. Thus, section 9—1(h), applicable to bench proceedings, states:

> "If the Court determines that there are no mitigating factors sufficient to preclude the imposition of the death sentence, the Court shall sentence the defendant to death." (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(h).)

Section 9—1(g) contains a similarly worded provision applicable to jury proceedings. Ill. Rev. Stat. 1985, ch. 38, par. 9—1(g).

The defendant contends that the statutory phrase "sufficient to preclude" unfairly burdens the defense with the task of negating the earlier eligibility finding. Noting that one dictionary definition of "preclude" is "to make impossible, especially in advance" (Webster's New World Dictionary 1120 (1976)), the defendant argues that the statute effectively requires the defense to show that what has been found in the first-stage, eligibility determination to be a possible sanction should in fact be precluded, or deemed impossible. The defendant maintains that these contradictory requirements bar the meaningful consideration of mitigating evidence, and that a conscientious sentencer, applying the statute liter-

ally, would not be able to return a sentence other than death once it found a person eligible for the death penalty. We do not agree.

The defendant's theory rests on a strained interpretation of the statutory language. Rejecting the same argument in other cases, we have observed that the sentencing authority is asked only to determine whether death is the appropriate sanction in the particular case. (*People v. Mitchell* (1992), 152 Ill. 2d 274, 345-46; *People v. Hampton* (1992), 149 Ill. 2d 71, 115-17.) The statutory language does not require the sentencer to find that the death penalty should be deemed "impossible."

In a further challenge to the constitutionality of the death penalty law, the defendant contends that various features of the statute, working in combination, enhance the risk that the sentence will be imposed in an arbitrary and capricious manner. The defendant mentions the following: the prosecutor's discretion in determining whether to seek the death sentence, the failure to require pretrial notice that the penalty will be sought, the limited comparative proportionality review undertaken by this court, the failure to require the sentencer to make written findings, the failure to limit aggravating evidence to matters divulged to the defense prior to trial, the failure to impose on the State a burden of proof at the second stage of the hearing, language in the statute that the sentencer may construe as placing a burden of proof on the defense, and the preclusion of the sentencer's consideration of what sentences would be available if the death penalty were not imposed. As the defendant acknowledges, we have previously rejected challenges to these particular aspects of the statute. (*People v. Pitsonbarger* (1990), 142 Ill. 2d 353, 407-09; *People v. Kokoraleis* (1989), 132 Ill. 2d 235, 289-91.) We do not believe that these features of the death penalty statute, in combination, render the sentencing scheme in-

valid. As this court stated previously, "If all of the individual aspects are constitutional, we stand by the conclusion that the whole is also constitutional." *People v. Phillips* (1989), 127 Ill. 2d 499, 542-43.

The defendant also raises a challenge to the sentences of imprisonment imposed for the nonmurder felony convictions in the present case. As we have discussed, the trial judge sentenced the defendant to prison terms of 30 years for the armed robbery of Officer Dawson, 30 years for the attempted murder of Officer Stutzman, 15 years each for the aggravated kidnapping of Donald Hamburg and of Hamburg's grandson and nephew, 15 years for the armed robbery of Hamburg, and 30 years for the attempted murder of Officer Gross. All the sentences were to run consecutively, except those imposed for the offenses involving Hamburg and the two boys, which were to run concurrently with each other. The defendant contends that the trial judge erred in failing to make all the terms of imprisonment concurrent.

Section 5—8—4(a) of the Unified Code of Corrections provides, in pertinent part:

> "The court shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective, unless, one of the offenses for which defendant was convicted was a Class X or Class 1 felony and the defendant inflicted severe bodily injury, in which event the court may enter sentences to run consecutively. Sentences shall run concurrently unless otherwise specified by the court." (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—4(a).)

Although the additional felonies here were either Class X or Class 1 felonies, they did not involve the infliction of severe bodily injury. Accordingly, the defendant's consecutive sentences cannot be sustained if the underlying offenses "were committed as part of a single course of

conduct during which there was no substantial change in the nature of the criminal objective."

We find no error in the trial court's determination to impose consecutive sentences. The defendant's offenses were committed serially, with substantial breaks in time and changes in purpose. The defendant's first conviction is for the murder of Officer Dawson. After the defendant committed that offense, he fired at Officer Stutzman as he and his brother escaped from the scene. Later, in Buffalo Grove, the defendant and his brother came upon the Hamburg vehicle and forced Hamburg at gunpoint to drive them from the area; also in the car were Hamburg's grandson and nephew. Finally, in Chicago, after Hamburg stopped in front of Officer Gross' squad car, the defendant fired at the officer. Thus, following the murder of Officer Dawson, the defendant committed three separate sets of offenses. With each set of offenses there occurred a substantial shift in the nature of the criminal objective. On this record, then, we conclude that the trial judge did not err in imposing consecutive sentences for the different sets of felonies.

As a final matter, we shall consider two arguments raised by the defendant in a *pro se* brief submitted to this court. The defendant first contends that if his murder conviction is reversed on direct or collateral review, principles of double jeopardy would bar his being sentenced again for that offense. We would note that the defendant's argument is premature, for we have affirmed his conviction for murder. In any event, defendant could be retried, and resentenced, if the initial conviction or sentence were reversed for reasons of error in the original proceedings. (See *Poland v. Arizona* (1986), 476 U.S. 147, 90 L. Ed. 2d 123, 106 S. Ct. 1749; *Burks v. United States* (1978), 437 U.S. 1, 57 L. Ed. 2d 1, 98 S. Ct. 2141; *People v. Davis* (1986), 112 Ill. 2d 78.) A subsequent conviction or sentence of death would be

barred only if the original conviction or death sentence were reversed for reasons tantamount to an acquittal. *Poland*, 476 U.S. 147, 90 L. Ed. 2d 123, 106 S. Ct. 1749; *Burks*, 437 U.S. 1, 57 L. Ed. 2d 1, 98 S. Ct. 2141; *Davis*, 112 Ill. 2d 78.

The defendant next argues that he was twice placed in jeopardy when he was convicted of felony murder even though the trial court had directed findings in his favor on two of the predicate felonies for that offense. In the present case, the defendant was charged in separate counts with the felony murder of Officer Dawson while engaged in the commission of several different felonies; the defendant was charged with murder under other theories, too. Count III of the indictment charged the defendant with felony murder based on the residential burglary of the Ross residence; count IV charged felony murder based on the residential burglary of the Hodge home; count XI charged felony murder based on the defendant's armed robbery of the officer. The defendant was also charged with residential burglary and armed robbery.

The trial judge entered findings in the defendant's favor on the residential burglary charges but found the defendant guilty of all the other charges, including the various felony-murder counts. Later, however, the judge corrected himself, and stated that the murder conviction did not rest on the two felony-murder counts having residential burglary as their predicate offense. The judge's action in correcting the record seemingly addresses the defendant's concern in this regard. We would note that the remaining charge of felony murder, predicated on the defendant's robbery of the officer, is valid, and may stand.

* * *

For the reasons stated, we reverse the defendant's

conviction for the armed robbery of Donald Hamburg and vacate the 15-year prison term imposed for that offense. We affirm the judgment of the circuit court in all other respects. The clerk of this court is directed to enter an order setting Monday, March 15, 1993, as the date on which the sentence of death, entered in the circuit court of Cook County, is to be carried out. The defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1991, ch. 38, par. 119—5). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution where the defendant is now confined.

*Convictions affirmed in part*
*and reversed in part;*
*death sentence affirmed.*