THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOHN DERR, Defendant-Appellant.

Fifth District    No. 5—01—0977

Opinion filed February 25, 2004.

Michael A. Gross, of St. Louis, Missouri, for appellant.

William A. Mudge, State's Attorney, of Edwardsville (Norbert J. Goetten, Stephen E. Norris, and Patrick D. Daly, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE KUEHN delivered the opinion of the court:

Life is short—shorter for some than others.

Dennis Oberbeck's life was cut short on August 14, 1992, at the age of 43, when he succumbed to the kind of trauma that most men can easily survive. Oberbeck's .377 blood-alcohol level at the time of his death might well have proved lethal all by itself. However, the medical examiner who performed the autopsy upon Oberbeck's body felt that death was caused by more than alcohol poisoning. Superficial abrasions over Oberbeck's right eye and about his upper lip, markings that appeared to be the product of someone's fists, led the medical examiner to conclude that blows to the face worked in tandem with Oberbeck's extreme inebriation to produce the cardiac arrest that ended his life.

Dennis Oberbeck's drunkenness rendered him vulnerable to any form of trauma. As circumstance would have it, he simply could not take a punch. When John Derr, the defendant, for reasons unknown, punched Oberbeck's face, Oberbeck's brain ceased sending impulses to the heart. When it shut down, lifeblood ceased to flow, and he perished.

The circumstances of this untimely death remained a mystery for several years. Then, in early 1996, as the defendant's marriage to Sherry, his wife, began to unravel, an answer to the mystery unraveled with it. Sherry broke silence to reveal a dark secret kept for several years. Her revelations to law enforcement officials explained how Dennis Oberbeck's body ended up in the backyard of an abandoned house on the outskirts of St. Louis, Missouri.

Sherry described to the authorities how her husband summoned her in the wee hours of August 14, 1992, to a vacant Granite City dwelling that the couple owned. He showed her Dennis Oberbeck's lifeless body on the living room floor. Sherry, a retired nurse, examined the body for a pulse, and it had none. She claimed that immediately thereafter her husband showed her a watch and a ring that belonged to Oberbeck.

Sherry also told the authorities of how Oberbeck's corpse was loaded into her husband's van, of how she followed her husband in her vehicle as he drove the van west across the Mississippi River, into the State of Missouri, and of how she lost her husband when she heeded a stoplight that he traversed. After watching his van disappear into the early morning darkness, she turned around and returned home. Sherry claimed to have seen her husband jettison the watch and the ring in the Mississippi River bottoms before he crossed into Missouri.

Investigators finally found an answer to the mystery of how the remains of an Illinois man, last seen just outside his favorite haunt in Bethalto, Illinois, came to rest in an unweeded garden grown to seed on the edge of the St. Louis city limits.

Several witnesses who had reported seeing a stranger with their friend, Dennis Oberbeck, the night of his demise were contacted by detectives. They were able to identify the defendant as that stranger. They saw him having what appeared to be a confrontational conversation with Oberbeck on the parking lot of Geno's 140 Club in Bethalto at around 1:30 a.m. on August 14, 1992. It was the last time that any of them saw Oberbeck alive.

In addition to developing a number of eyewitnesses who could place the defendant in Oberbeck's company the morning of his death, detectives procured a tape recording of a telephone conversation between the defendant and his estranged wife. They obtained an eavesdropping order that authorized them to record Sherry's conversations with her husband and, thereafter, directed Sherry to call him. She was instructed to engage him in conversation that would corroborate her claims. During the conversation, the defendant was repeatedly angered when Sherry tried to initiate talk about Oberbeck's death. He was obviously leery about being taped. He issued Sherry several warnings not to engage in such conversation and protested that he did not know what she was talking about. He also volunteered a self-serving proclamation that he would never kill anyone.

For all the defendant's effort to avoid the production of an incriminating tape recording, the conversation, in its entirety, conveyed a very incriminating message. The recorded conversation

clearly established the existence of a forbidden secret that the defendant did not want discussed over the phone. The Derrs shared knowledge about some unsavory and unmentionable past event in their lives, the subject about which the defendant did not want to converse. The tape's implicit message corroborated Sherry's belated claims to law enforcement officials.

A criminal prosecution ensued. The case that it engendered has traveled a lengthy and tortured path. The case arrives before us for a second time. Here is a look at its procedural history.

The defendant was initially charged with involuntary manslaughter and concealment of a homicidal death. The two charges were filed on January 18, 1996. On January 22, 1996, the defendant's attorney filed a demand for a speedy trial. Thereafter, a bevy of continuance requests tolled the statutory time constraints. The trial was delayed by the defendant for more than two years. In the spring of 1998, the defendant entered an *Alford* plea (*North Carolina v. Alford*, 400 U.S. 25, 27 L. Ed. 2d 162, 91 S. Ct. 160 (1970)), conceding the State's ability to convict him of involuntary manslaughter. In exchange, the State dismissed the charge of concealing a homicidal death. The trial judge scheduled July 17, 1998, for sentencing.

On July 17, 1998, defense counsel requested another continuance, apparently engendered by a disagreement between defense counsel and the State over the terms of the defendant's open plea. Shortly thereafter, defense counsel filed a motion to withdraw the *Alford* plea. On July 22, 1998, the trial judge granted that motion, defense counsel having represented that he had procured the defendant's willingness to accept the plea bargain by assuring the defendant that he would receive probation as a punishment. The charge of concealment of a homicidal death was reinstated, and the case was rescheduled for a trial.

After several more postponements at the behest of the defendant, the case was set for a trial on November 16, 1998.

On November 9, 1998, almost three years after the original charges had been lodged and almost three years after the defendant had demanded a speedy trial on those charges, the State filed a motion for leave to file an amended information. The motion set forth that no prejudice would result to the defendant from the desired amendments because "the additional counts do not arise out of any additional facts or circumstances." In effect, the motion set forth why the new charge was subject to compulsory joinder.

The State was allowed to file an amended information that charged first-degree murder based upon a theory that Dennis Oberbeck's death had occurred during a forcible felony. After almost three years of

pursuing an involuntary manslaughter conviction for the death of Dennis Oberbeck, the State decided to pursue a murder conviction through proof that the defendant had taken a watch and a ring off Dennis Oberbeck's body after the fight that led to his injury and death. The State charged that Oberbeck had died during the commission of a robbery.

Defense counsel filed a motion to dismiss the felony-murder charges, based upon a claim of vindictive prosecution. Counsel maintained that the State raised the stakes with a belated murder charge merely to punish the defendant for withdrawing his earlier plea. The effort to dismiss the new charges failed. Defense counsel did not raise the fact that none of the numerous continuances óbtained on the pending charges over the years had tolled the speedy trial demand on charges that should have been joined in the charging document from the prosecution's inception. In other words, defense counsel failed to pursue the defendant's speedy trial rights, a legal avenue that would have protected him from the murder charge. See *People v. Williams*, 204 Ill. 2d 191, 212-13, 788 N.E.2d 1126, 1140 (2003). The violation of the defendant's speedy trial guarantee lays forfeit by virtue of counsel's shortcoming.

After several days of trial, a Madison County jury found the defendant guilty of first-degree murder, involuntary manslaughter, and concealment of a homicidal death. The trial judge imposed a 25-year prison term for the commission of murder and 5-year prison terms for the other offenses. The five-year sentence for concealing the homicidal death was imposed to run consecutively.

The defendant appealed. On September 18, 2000, we reversed the defendant's convictions and remanded for a new trial. *People v. Derr*, 316 Ill. App. 3d 272, 736 N.E.2d 693 (2000). In order to avoid a double jeopardy claim, we examined the State's evidence and held that it was sufficient to sustain the charge of murder. *Derr*, 316 Ill. App. 3d at 276, 736 N.E.2d at 698. The opinion contained a lengthy discussion of felony murder. *Derr*, 316 Ill. App. 3d at 277, 736 N.E.2d at 699. It also discussed the offense of robbery. *Derr*, 316 Ill. App. 3d at 277, 736 N.E.2d at 699. Passages from the opinion played a key role in the outcome of the defendant's second trial.

In September of 2001, the State successfully prosecuted the case again. The defendant received the same punishment meted out after his first trial. The defendant now appeals his first-degree-murder conviction and his conviction for concealing the homicidal death. In an unpublished portion of this opinion, we affirm the defendant's conviction for having concealed a homicidal death. However, we overturn the defendant's first-degree-murder conviction for a second time.

During the retrial, the trial judge used language from our earlier opinion to answer an inquiry from the jury. Two sentences from the first *Derr* opinion were combined in an effort to clarify the standard felony-murder issues instruction for a jury that expressed confusion over the instruction. The message formulated from the conflation of the two unrelated passages, one dealing with felony murder and the other discussing the offense of robbery, while accurate statements of law, in combination harbored a potential for confusion and an ability to mislead the jury.

We believe, in light of the State's evidence, the nature of the jurors' inquiry, and the response that the jury received, that the defendant's first-degree-murder conviction might well have resulted from juror misunderstanding over how to apply the law to the evidence in this case. We are uncertain whether the jury fully understood that the predicate felony offense of robbery required proof that the blows inflicted upon Oberbeck and the removal of his watch and ring had to take place at or about the same time. In order to properly decide the felony-murder count, the jury had to clearly understand that the removal of the watch and ring from Oberbeck's person had to occur right after the blows to the head had been inflicted, in order to constitute the offense of robbery. The defendant could not be convicted of felony murder if he performed the acts that caused death and, later in the evening, hours after the death, he decided to remove the watch and ring in order to make Oberbeck's demise appear to be motivated by robbery.

The defendant's second trial began on September 17, 2001. On September 24, 2001, the evidence closed and a jury-instruction conference was conducted. The State tendered the standard Illinois pattern instruction that sets forth the propositions that need to be proven in order to sustain a felony-murder charge. It was given to the jury. It read, in pertinent part:

"First Proposition: That the defendant performed the acts which caused the death of Dennis Oberbeck; and

Second Proposition: That when the defendant did so, he was committing the offense of Robbery; and

Third Proposition: That the offense of First Degree Murder occurred in Madison County."

The assistant State's Attorney tendered an additional instruction not among those contained in our Illinois pattern instructions. He had fashioned it from parts of our decision in *People v. Derr*. He took one sentence from the opinion in which we had noted that the victim of a forcible felony does not have to die during its commission. If a death occurs from acts performed during a felony murder, it does not matter

that death comes in belated fashion. *People v. Derr*, 316 Ill. App. 3d 272, 277, 736 N.E.2d 693, 699 (2000). He combined this concept with two sentences, from a later passage in the opinion, that discuss the timing of the two elements of a robbery offense. The proposed nonpattern instruction read:

> "Death does not have to be contemporaneous with the commission of the forcible felony. The prosecution is not required to prove in any particular order the force and taking elements of a robbery charge. The prosecution needs only to show some concurrence between the force used and the taking of the property."

The trial judge correctly refused to give this tendered instruction to the jury.

Its submission is understandable, given the State's evidence. That evidence could place the defendant with Oberbeck very close in time to his death. It could establish that Oberbeck had been hit in the face with a fist and that the blows that he had received, in combination with high alcohol levels in his bloodstream, proved fatal. It could also place the defendant in physical possession of a lifeless Oberbeck's watch and ring.

However, the State's evidence could not discount the possibility that the watch and ring were removed from Oberbeck's body hours after his death, as a part of the defendant's plan to conceal the homicide and mislead those who would investigate its commission. It could not discount the possibility that the blows that the defendant inflicted had nothing to do with the watch and ring and that the acts causing Oberbeck's death had been performed hours before the defendant decided to remove those items from a cold, stiffening corpse.

The proposed instruction's message would have been misleading. It would have easily allowed jurors to mistakenly conclude that the defendant could be guilty of felony murder even if he was not in the process of committing a robbery when he performed the acts which caused death.

The instruction provides us with a good example of what can happen when lawyers try to piece together a jury message from passages of judicial opinions. Lawyers and judges have no problem understanding words like "concurrence." Concurrent sentences are punishments served "at the same time." The passage "some concurrence between the force used and the taking of the property" simply means that the use of force and the taking of property have to occur at or around the same time. Jurors could understand how robbery's two elements have to be joined in a continuum of time if they are told that the force and the taking had to occur at the same time. However, whether jurors could decipher "some concurrence" to mean that the use of force and

the taking of property must happen at or around the same time is not entirely clear.

After the instruction conference, the State and the defense argued their respective positions to the jury, and it commenced deliberations to a verdict. After a considerable passage of time, the jury sent the trial judge the following written question:

"Judge, for the charge of First Degree Murder, the State must prove the first, second, and third propositions. Please clarify the second proposition as to the phrase 'when the defendant did so he was committing the offense of Robbery.' Does the second proposition *'have'* to take place *'during'* the first proposition? How closely related in time or action does [*sic*] the first and second proposition [*sic*] relate? Thanks." (Emphasis in original.)

The questions underscore the dearth of proof on the issue of the timing between the blows to Oberbeck's face and the removal of his watch and ring. Jurors focused upon the critical measure of guilt or innocence when it came to felony murder. They were asking the judge to explain whether the timing between the blows to Oberbeck's face and the removal of his property mattered. Without proof of when the defendant took property from Oberbeck's person, it was reasonable for jurors to wonder whether Oberbeck and the defendant simply got into a drunken argument that led to a fistfight. It was certainly possible, and jurors could easily conclude from the evidence, that the defendant had struck Oberbeck out of pure alcohol-induced anger instead of a design to take any of Oberbeck's property. It was equally possible, and jurors could easily conclude from the evidence, that the watch and the ring were not removed until hours after Oberbeck's demise and that their removal was a part of the defendant's plot to conceal the true nature of what had happened.

On a rehearing in this appeal, the State submitted argument that the defendant's intentions when he threw the punches that contributed to the death were unimportant to the jurors' decisionmaking. It argued that, under the law, the defendant did not have to intend to take property when he applied force and that he could arrive at the decision to take the watch and the ring as an afterthought and still commit robbery. See *People v. Jordan*, 303 Ill. 316, 135 N.E. 729 (1922) (If, as a result of a quarrel, a fight occurs in which one of the parties is overcome and the other, then, without having formed the intention before the fight began, takes the money of the vanquished one, the offense committed is robbery). The State also maintained that exactly when and why the defendant removed the watch and the ring proves unimportant to the question of whether he committed robbery and, thus, felony murder. The several-hour time span within which the

defendant may have decided to take the watch and the ring and his reasons for removing them from the body bear no significance to the State or its position on felony murder. The State is convinced that whenever the defendant decided to remove items from Oberbeck's person, he completed an ongoing robbery, commenced when he threw the punches that incapacitated Oberbeck, and that the defendant's criminal liability for Oberbeck's death became fixed at felony murder when the watch and the ring were taken.

The defendant could convert a simple argument and fight into a robbery after incapacitating Oberbeck. If the defendant took the watch and the ring after rendering Oberbeck unconscious and the taking was close enough in time to be deemed concurrent with the use of force, a robbery would have occurred. However, the question of whether the use of force and the taking of property could be viewed as having occurred at the same time assigns importance to precisely when and why items were removed from Oberbeck's body. If the defendant threw several punches that did Oberbeck in and then either immediately or very shortly thereafter decided to help himself to Oberbeck's property, he would be guilty of robbery and felony murder. See *People v. Strickland*, 154 Ill. 2d 489, 609 N.E.2d 1366 (1992). However, if the defendant threw the punches, discovered Oberbeck's unanticipated death, thereafter transported him to a vacant house in Granite City to ponder a course of action, and decided hours later to remove the watch and the ring as a part of his plan to cover his tracks, the defendant would not have committed robbery and felony murder. In that event, the blows to Oberbeck's face would not have been delivered during the commission of a robbery, because the force used and the taking of property were disconnected. The blows and the removal of property would not have occurred at or around the same time. The two actions would lack the continuous character found in those cases that find the kind of concurrence between the use of force and the taking of property that results in criminal liability for robbery and felony murder. See *People v. Pitsonbarger*, 142 Ill. 2d 353, 568 N.E.2d 783 (1990); *Strickland*, 154 Ill. 2d 489, 609 N.E.2d 1366.

Thus, the answers to the jury's questions were critically important to a well-reasoned decision in this case. Implicit in the jury inquiry lies the question of whether it would still be felony murder if the defendant relieved Oberbeck of his property at a point in time distant from striking him in the face.

■ The trial judge recognized that she was duty-bound to formulate an answer to the inquiry. See *People v. Childs*, 159 Ill. 2d 217, 228-29, 636 N.E.2d 534, 539 (1994). The law expects trial judges to assist confused jurors when they express a lack of understanding about the application of instructions to the facts that they must weigh.

When we review how trial judges deal with jury inquiries seeking supplemental instruction, we use an abuse-of-discretion standard. *People v. Millsap*, 189 Ill. 2d 155, 161, 724 N.E.2d 942, 945 (2000).

The obvious answer to the jury's question, "Does the second proposition '*have*' to take place '*during*' the first proposition?" is a simple "Yes." The acts that cause death must occur while the defendant is committing or attempting to commit robbery. The acts that cause death must be performed during the commission of a robbery. The answer to the second part of the jury's inquiry is simple as well. The jury asked, "How closely related in time or action does [*sic*] the first and second proposition [*sic*] relate?" The jury should have been told that the acts which caused death and the commission of the robbery had to occur at the same time. In a word, the jury should have been told that the robbery had to have been *contemporaneous* with the acts that caused Oberbeck's death, in order to convert the acts and resulting death into a felony murder.

Instead of simply telling the jurors that the acts which caused Oberbeck's death had to have been performed *during* the commission of a robbery, the trial judge told the jury the following:

> "Death does not have to be contemporaneous with the robbery; however, there must be some concurrence between the force used and the taking of the property."

■ Obviously, a death does not have to occur at the same time that a forcible felony is committed in order to constitute felony murder. A robbery victim can linger for months before dying and it is still felony murder, *provided the acts that caused the belated death were performed during the commission of the robbery*. A death and the conduct that causes the death are two very different things. Unfortunately, thinking that the judge was providing guidance and giving an answer to their question, jurors would not necessarily draw the distinction. They could easily conclude that the use of the word "death" in answer to their question was synonymous with the performance of the acts which caused the death. Hence, the trial judge's answer could have led jurors to incorrectly believe that the acts which caused Oberbeck's death did not have to be performed during the commission of a robbery.

The jury was not asking the judge to clarify whether Oberbeck had to die before the robbery was completed in order for the offense to constitute felony murder. Nor was the jury asking for guidance about the offense of robbery. The jury wanted to know whether the State had to prove that the acts which caused the death, the blows to Oberbeck's face, had been delivered during the commission of a robbery. The jury wanted to know if it was still felony murder if the property had been taken off Oberbeck's body at a time far removed from the delivery of the punches that caused the death.

By answering the question with two sentences from the State's proposed nonpattern instruction, the trial judge provided a decidedly misleading message, capable of guiding jurors to convict even though they harbored a reasonable doubt about whether the defendant struck Oberbeck during the commission of a robbery. The failure to provide a proper answer to the jurors' inquiry constituted an abuse of the trial judge's discretion and infected the trial's outcome with error. There is no way of knowing whether the jury's verdict would have been the same had the jurors received a different answer to their question. We believe that a reasonable possibility exists that a different result might have been reached in the absence of the message that the jurors received. Accordingly, we reverse the defendant's first-degree-murder conviction, and we remand for a new trial on any of the various homicide charges applicable to the facts of this case.

For these reasons, we affirm in part and reverse in part, and we remand this cause for a new trial on the murder charge.

Affirmed in part and reversed in part; cause remanded.

HOPKINS and DONOVAN, JJ., concur.