2022 IL App (1st) 181259-U
No. 1-18-1259

FIRST DIVISION
December 19, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 06 CR 19060 |
| | ) | |
| JAMES McDURMON, | ) | Honorable |
| | ) | Timothy J. Chambers, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE PUCINSKI delivered the judgment of the court.
Presiding Justice Hyman and Justice Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*: Following our court's order finding a *bona fide* doubt as to defendant's fitness and remanding for a retrospective fitness hearing, the trial court incorrectly stated at the hearing that it was defendant's burden to prove his lack of fitness. This compromised the fairness of the hearing, constituting second-prong plain error. We thus reverse the determination of fitness at the retrospective fitness hearing and remand for a new hearing.

¶ 2    After defendant-appellant James McDurmon was found fit to stand trial, a jury found him guilty of first degree murder and he was sentenced to 60 years' imprisonment. On direct appeal, we found there was a *bona fide* doubt as to his fitness at the time of sentencing and thus remanded for a retrospective fitness hearing. *People v. McDurmon*, 2014 IL App (1st) 113585-U.

On remand, the trial court conducted the hearing but repeatedly stated that there was a presumption of fitness and that defendant bore the burden to demonstrate his unfitness at sentencing. The trial court found defendant was fit.

¶ 3    On appeal, defendant first contends that he should receive a new retrospective fitness hearing because the trial court erroneously placed the burden on him. In the alternative, he argues that his 60-year sentence was excessive. For the following reasons, we find that the trial court's reliance on an incorrect burden of proof was plain error, necessitating remand for a new retrospective fitness hearing. Because a new retrospective fitness hearing may lead to a new sentencing, we do not address defendant's separate challenge to his sentence as excessive.

¶ 4    BACKGROUND

¶ 5    Defendant was charged with two counts of first degree murder for the August 1, 2006 shooting death of his brother, Lester McDurmon.

¶ 6    Pre-Trial Fitness Assessments

¶ 7    In 2007, Dr. Andre Kulik, a psychiatrist, found defendant unfit for trial because he suffered from delusions. In January 2008, Dr. Peter Lourgos interviewed defendant and found that his delusions precluded him from effectively assisting counsel. On January 16, 2008, the trial court entered an order finding defendant unfit and remanded him to the Department of Human Services (DHS).

¶ 8    The record reflects that defendant was a patient at the DHS's Elgin Mental Health Center ("Elgin"). In April 2008, Elgin submitted a progress report to the court stating that defendant had been restored to fitness. Elgin included a March 2008 evaluation in which Dr. Farzana Husain, a psychiatrist, found defendant was fit to stand trial.  On May 27, 2008, the court found defendant

"fit." However, in June 2009, Dr. Lourgos informed the court that he had recently examined defendant and found him unfit for trial due to his "delusional ideations." In July 2009, the court found defendant unfit for trial. Defendant again entered treatment at Elgin.

¶ 9    In October 2009, staff at Elgin (Dr. Romulo Nazareno and social worker Stephen Fossing) evaluated defendant and found him unfit to stand trial. Specifically, they opined defendant could not assist his counsel because he could not "communicate in a calm and logical" manner about his case. In January 2010, Dr. Nazareno and Fossing again found defendant unfit.

¶ 10    In May 2010, Elgin submitted a progress report stating that defendant had been restored to fitness. The supporting evaluation by Dr. Husain and social worker Carol Borsinger noted that defendant refused medication and declined to engage in any evaluation. Also in May 2010, Dr. Lourgos informed the court that he could not reach an opinion because defendant refused to respond to questions. A July 2010 evaluation by Dr. Husain and Borsinger found that defendant was fit and was "malingering" to avoid court. In August 2010, Dr. Lourgos reported that defendant still refused to cooperate. In October 2010, Dr. Husain and Borsinger reiterated their opinion that defendant was fit for trial.

¶ 11    Following a fitness hearing on November 5, 2010, the court found defendant fit to stand trial.

¶ 12    Defendant's Murder Trial

¶ 13    Defendant asserted an insanity defense at trial. Defendant's mother, Peggy McDurmon, testified that defendant had a history of delusions. Dr. Robert Hanlon testified for the defense that defendant's delusions made him unfit for trial, but Dr. Hanlon could not form an opinion as

to whether defendant was sane when he shot Lester. The jury found defendant guilty of first degree murder and found that he had personally discharged a firearm causing death.

¶ 14     Post-Trial Proceedings

¶ 15     After defense counsel filed a motion for a new trial, defendant sought leave to represent himself. Defendant told the court he did not trust his trial counsel, Jim Mullenix, because "Jim himself got knocked down by the police." The trial court responded that it had "no idea what that means," but the court eventually permitted defense counsel to withdraw.

¶ 16     Defendant subsequently submitted a *pro se* motion for a new trial. While arguing that motion in court, defendant made numerous statements that lacked any factual basis, including that a testifying police officer was being investigated for "mob activities", that his trial counsel "sought financial compensation" from his brother's widow, and that his trial counsel "tried to plead [defendant] guilty." The court denied the motion for a new trial.

¶ 17     At the November 30, 2011 sentencing hearing, defendant told the court that his "brother was no saint" but that he was "not exactly sure what happened." The court imposed a 35-year murder sentence, with an additional 25 years for personal discharge of a firearm, for a total sentence of 60 years' imprisonment.

¶ 18     Direct Appeal

¶ 19     On direct appeal, defendant argued that the court erred in (1) finding him fit to stand trial, (2) failing to hold a new fitness hearing before sentencing, and (3) sentencing him to 60 years in prison despite his mental illness and lack of criminal history. *People v. McDurmon*, 2014 IL App (1st) 113585-U.

¶ 20    This court declined to find the trial court erred in finding defendant fit for trial. *Id.* ¶¶ 24-27. However, given defendant's "history of delusions" and his "numerous mistaken assertions about what happened in the courtroom," we found the trial court erred in failing to rule *sua sponte* that defendant's post-trial behavior "raised a *bona fide* doubt as to his fitness for sentencing." *Id.* ¶ 31. In turn, the trial court should have held a "fitness hearing *sua sponte* before sentencing." *Id*. ¶ 34. We remanded for the trial court to conduct a retrospective fitness hearing. *Id*.[1]

¶ 21    Proceedings Upon Remand

¶ 22    On remand, numerous proceedings occurred before the retrospective fitness hearing was conducted. At a July 2015 hearing, defendant told the court he wanted a "new attorney." The court remarked that defendant should be evaluated before he could "make these kind of decisions," and thus ordered a behavioral clinical evaluation.

¶ 23    Dr. Brian Curran submitted a letter to the court in September 2015 stating that defendant refused to participate in an evaluation. At a number of hearings in October 2015, defendant told the court that he was not willing to participate in a mental health evaluation. At one of those hearings, when asked why he would not cooperate with an evaluation, defendant answered: "I worked with them once before, and got a 60-year bit, and they wrote down nothing but lies."

¶ 24    In February 2016, the court remanded defendant to DHS for a seven-day observation period. The record reflects that defendant did not participate in an attempted April 2016 evaluation. In September 2016, the court again ordered a seven-day observation period and evaluation by DHS.

---

[1]    Because we recognized that remand for a retrospective fitness hearing "may lead to resentencing", our order did not address defendant's claim that his sentence was excessive. *Id*. ¶ 32.

¶ 25    In June 2017, the court conducted a hearing to determine whether defendant was fit to participate in the retrospective fitness hearing. Dr. Muddasani Reddy, a psychiatrist at the DHS's Chester Mental Health Center, testified that he observed defendant on a number of occasions. When he met with defendant in February 2017, defendant refused to cooperate with Dr. Reddy's attempt to assess him. Dr. Reddy testified that he did not see evidence of "serious mental illness," that he believed defendant's refusal to cooperate was purposeful, and that defendant was fit. At the conclusion of the hearing, the court found that defendant had been restored to fitness, and that the retrospective fitness hearing could proceed.

¶ 26    Retrospective Fitness Hearing

¶ 27    The retrospective fitness hearing began on February 23, 2018. The State called Dr. Brian Curran, a staff psychologist at Forensic Clinical Services for the Circuit Court of Cook County. Dr. Curran testified that he was asked to render an opinion on defendant's fitness in September 2015 and again in January 2016. When he met defendant in September 2015, defendant told him that he "respectfully refuse[d] the services" and refused to cooperate in the evaluation. Dr. Curran did not notice "overt symptoms" of mental illness, and defendant's refusal to participate appeared to be volitional. When he saw defendant on January 21, 2016, defendant again "refused to participate" in an evaluation. Again, Dr. Curran noticed no "overt psychiatric symptoms" and he believed defendant's refusal was "volitional in nature."

¶ 28    Dr. Curran again met with defendant on June 12, 2017, for a retroactive evaluation to assess whether he had been fit at the time of sentencing in November 2011. Dr. Curran testified that as he entered the evaluation room, he overheard defendant saying, "This isn't going to take long." After Dr. Curran entered, defendant immediately stated "I respectfully refuse your

services, sir." Dr. Curran "advised [defendant] of the Court ordered nature of the evaluation" but defendant repeated that he would not cooperate. Dr. Curran saw no "significant symptoms of a mental condition." Dr. Curran opined that defendant's refusal was "volitional."

¶ 29    Separate from his personal interactions with defendant, Dr. Curran testified that he reviewed numerous medical records, including Elgin records from defendant's admission in September 2009 until October 2010. Those records reflected that when defendant was admitted, he was found to have "paranoid delusions" but refused to take medication. He was diagnosed with "delusional disorder, persecutory type." However, an April 2010 evaluation at Elgin reflected that defendant did not express delusions. Defendant reportedly stated at that time that he would "not engage in any type of evaluation because he distrusts the evaluation process."

¶ 30    Dr. Curran also testified about the July 2010 evaluation by Dr. Husain and Bosinger which found that defendant was intentionally "malingering." Dr. Curran testified this meant defendant had the ability to participate in evaluations but did not in order to "avoid the court system, specifically prison time."

¶ 31    Dr. Curran also described his review of medical records from the Illinois Department of Corrections (IDOC). A December 5, 2011 evaluation by IDOC diagnosed defendant with an "adjustment disorder unspecified." IDOC records from December 14, 2011 stated defendant was "calm" and "cooperative" and again listed his diagnosis as "adjustment disorder." Dr. Curran testified that "[a]djustment disorder is a fairly benign mental disorder."

¶ 32    Dr. Curran also testified that he reviewed records from Cermak Health Services of Cook County (Cermak) between September 2011 and January 2012. Those records indicated that defendant was "not receiving mental health treatment of any kind." Dr. Curran also reviewed

Cermak records from September and October 2015, which were "the next records available" to him. According to Dr. Curran, those records did not reflect "any concerns regarding symptoms of a mental illness that would require him to be placed in mental health housing."

¶ 33    Dr. Curran also testified he had reviewed the transcripts of the November 2011 post-trial hearings, including defendant's *pro se* argument to the court.  Dr. Curran testified that although defendant's statements may have been "ineffective or possibly clumsy", "there is a coherence there, there is a logical linear direction to what he is asking." Dr. Curran opined that, although certain of defendant's statements to the court may have been untrue, this did not necessarily mean defendant was delusional. Dr. Curran opined that defendant was "attempt[ing] to malinger or maneuver his case to serve his own best interest."

¶ 34    Dr. Curran concluded, based on the materials he reviewed, "there is an absence of [defendant] manifesting any sorts of mental illness, and specifically any symptoms of delusional disorder."  Dr. Curran found defendant's behavior was "questionable", in that defendant had been "working effectively with his counsel through the trial," but after he was found guilty, "this is when the issue arises where he makes claims about ineffective assistance of counsel, wants to fire his lawyer and proceed *pro se*." Dr. Curran opined that defendant "was fit to be sentenced on November 30, 2011." The State rested after Dr. Curran's testimony.

¶ 35    When the hearing resumed, defendant called Dr. Robert Hanlon, a professor of neurology and psychiatry. Dr. Hanlon testified that he was first retained by defendant's trial counsel, Jim Mullenix, to evaluate defendant's fitness for trial. Dr. Hanlon evaluated defendant on December 11, 2008, during which he "administered a battery of neuropsychological and psychological tests."  Dr. Hanlon found defendant's IQ was "in the low-average range, and at the 21st

percentile." He showed "evidence of relatively mild memory instability and some evidence of mild executive dysfunction." At that time, Dr. Hanlon found "no evidence of malingering."

¶ 36    Reviewing his report from the December 2008 evaluation, Dr. Hanlon testified about what defendant told him about Lester's shooting. Defendant indicated that he remembered eating dinner with Lester, after which defendant felt "a sharp pain in my neck and it's the last thing I remember." Defendant said he did not know what actually happened, but "[a]t some point I realized my brother was dying on the floor so I went to get help" and "flagged down a cop." Defendant indicated he believed we has poisoned by a dart from a blowgun.

¶ 37    Defendant also told Dr. Hanlon that Lester had "set [him] up to be murdered at least half a dozen times." Defendant stated that over the course of many years, there had been "over 100 attempts on my life, over 1,000 attacks on my person." Defendant claimed he had been drugged with darts and had drugs secretly put into his drinks. Defendant also told Dr. Hanlon that he had won $80 million from three separate lottery tickets, one of which his brother had stolen.

¶ 38    Dr. Hanlon believed defendant was manifesting "delusional beliefs" and diagnosed him with "delusional disorder, persecutory type" and "personality disorder, not otherwise specified." He described delusional disorder as "characterized by fixed false beliefs that are highly rigid and extremely resistant to intervention and that they typically involve paranoia regarding harassment or manipulation by others." He testified that persons with delusional disorder "adamantly deny that they have any mental problems whatsoever because *** the delusional thoughts and beliefs are so deeply ingrained and rigid * * *." According to Dr. Hanlon, antipsychotic medications "often do not work" for persons with delusional disorder. Dr. Hanlon also explained that such persons often become "resistant to *** engagement with mental health professionals and

typically refuse to talk openly about their delusional beliefs because they come to generally mistrust most people."

¶ 39    Dr. Hanlon testified his review of records showed that a number of other doctors had diagnosed defendant with a delusional disorder, specifically: Dr. Kulik, Dr. Chrisopher Cooper, Dr. Lourgos, Dr. Michael Waltress, and Dr. Husain. Dr. Hanlon testified it was "extremely likely" that defendant continued to suffer from his delusional disorder.

¶ 40    According to Dr. Hanlon, there are no overt manifestations of delusions, and one can only become aware of them "by engaging in the patient" if the patient is willing to engage. Dr. Hanlon agreed that unless "you hear the content of those beliefs, you are not going to be able to perceive that [defendant] has any mental illness whatsoever."

¶ 41    Dr. Hanlon testified that in 2008 he believed defendant was unfit for trial.  After the court found defendant fit for trial, Dr. Hanlon met with defendant twice to assess whether he was insane at the time of the shooting. During those meetings, defendant maintained that he was drugged by a blow dart and had no memory of how his brother was killed. Dr. Hanlon believed at the time that defendant "was choosing not to be cooperative with me" in disclosing what he remembered about the crime. Dr. Hanlon did not think it was "probable" that defendant truly did not remember what happened. Dr. Hanlon was unable to make a determination as to whether he was insane at the time of the shooting. However, he testified at trial regarding defendant's delusional disorder.

¶ 42    In 2016, defense counsel reached out to Dr. Hanlon to assess whether defendant was fit at the time of his 2011 sentencing. Dr. Hanlon reviewed the records from Chester Mental Health, as well as court transcripts from trial, defendant's motion for a new trial, and sentencing hearing.

¶ 43    Dr. Hanlon opined that defendant had not been restored to fitness. He opined that defendant had a "chronic, untreated psychotic disorder, specifically, a deeply ingrained delusional disorder" with paranoia, persecutory ideation, grandiosity, and "the gross irrationality of his thought process."

¶ 44    Dr. Hanlon acknowledged that after 2010, defendant refused to engage in mental health evaluations. However, Dr. Hanlon believed that this was consistent with defendant's delusional disorder. He opined that, after participating in a number of evaluations, defendant realized that "doctors didn't believe him [about] all of the assaults, the attempted murders, the lottery winnings, [and] that he came to the conclusion *** that no one was believing what he said, which I strongly think that he very strongly believes." As a result, defendant "shut down and decided I'm no longer going to engage in these."

¶ 45    Dr. Hanlon agreed that defendant's post-trial statement that his trial counsel had been "knocked down" by the police, as well as his false assertions during his *pro se* posttrial argument, evidenced that defendant still suffered from delusions. Dr. Hanlon similarly testified that defendant's statement to the court at sentencing that he was "not exactly sure what happened" was evidence of his delusional thinking. Regarding defendant's statement to the court that his brother "was no saint," Dr. Hanlon testified that it was "profoundly irrational" and "the type of statement that a person suffering from delusions regarding his brother might say."

¶ 46    Dr. Hanlon specifically disputed that there was evidence of "malingering." He testified that malingering necessarily involves "intentional exaggeration or fabrication of symptoms," whereas defendant denied having any mental illness. Dr. Hanlon opined that defendant actually

believed the factual misstatements he made to the court, which reflected "delusional beliefs" and indicated defendant was unfit at the time of sentencing.

¶ 47    On cross-examination, Dr. Hanlon acknowledged he had not spoken with defendant since March 2011. He acknowledged his report did not mention Cermak records from September 27, 2011 or November 8, 2011 and did not recall whether he had reviewed them. Dr. Hanlon agreed that defendant understood the charges, the roles of the court personnel and the nature of the legal proceedings as of November 30, 2011. However, he maintained defendant was unfit because his delusions precluded him from rationally and logically assisting counsel in his defense.

¶ 48    Following Dr. Hanlon's testimony, the defense called Mullenix, defendant's former trial counsel. Mullenix recalled that after defendant was found fit for trial, he contacted Dr. Hanlon, who met with defendant to assess whether defendant was sane at the time of the shooting.  Dr. Hanlon was unable to evaluate him because defendant claimed "he could not remember the incident because he was hit with a blow dart."  Mullenix and Dr. Hanlon then visited defendant in jail together, but defendant "still was telling this bizarre story about being hit with a blow dart in his neck."  After that meeting, defendant "stopped cooperating" and would not talk to any doctors. After his trial, defendant fired Mullenix.

¶ 49    Mullenix testified that he tried to make it clear to defendant that it was "vital" for him to remember what happened on the date of the shooting, but defendant was "so delusional" he could not understand. Mullenix told defendant that "if he was faking it," he should "stop faking it and cooperate [be]cause this was important." Mullenix testified that in his layman opinion, defendant "clearly was not faking it."

¶ 50    The defense rested after Mullenix's testimony. The court then addressed defense counsel as follows:

> "THE COURT: You certainly bear the burden. Go ahead.
>
> [DEFENSE COUNSEL]: Do I bear the burden? I thought the State would bear the burden.
>
> THE COURT: No. The Appellate court says quite clearly on this issue James [defendant] bears the burden of proving that facts known to the Court raised a real, substantial and legitimate doubt as to his mental capacity to meaningfully participate in his defense and cooperate with counsel.
>
> [DEFENSE COUNSEL]: Thank you for pointing that out to me. I had not read that point but I will more than happily accept that burden * * * *."

¶ 51    Following the parties' closing arguments, the court proceeded to find defendant was fit at the time of sentencing.  In doing so, the trial court disputed the statement in our prior opinion that defendant "stood to gain nothing from the false assertions" he made after his trial. See *McDurmon*, 2014 IL App (1st) 113585-U, ¶ 31. The trial court remarked:

> "Well, the Appellate Court also says when [defendant] apparently stood to gain nothing from these false assertions, yet he's here, he's not in prison, he's back in court with yet another bite of the apple. It's as though had he told the truth, he wouldn't be here in court. He lied. He had nothing to gain from those false assertions,

- 13 -

it's completely wrong and his presence in this courtroom today proves that point."

¶ 52    The court proceeded to explain that it did not believe *defendant* had met his burden to show that he was unfit at the time of sentencing:

> "I wish during the testimony of your doctor [Dr. Hanlon] I could have – I should have counted the number of times I heard perhaps, maybe, it's possible, perhaps maybe it could be, it might be, it could still be, it could be delusional, it might have been delusional, it's possibly delusional. *There is a presumption of fitness and James McDurmon bears the burden of showing that he is not fit.* And on my own, I did not see him as being unfit."
>
> (Emphasis added.)

¶ 53    The court remarked it had dealt with "dozens" of *pro se* defendants who sometimes "say things that it takes a long time to try and figure out but that doesn't make them unfit." The court commented that *pro se* defendants "don't understand the law as well or motions as well or what is proper courtroom procedure as well" and the fact that their "statements on their own may not appear to be helpful to their case [is] to be expected."

¶ 54    The court then stated:

> "By the time this trial started, the defendant was fit. He was found fit by Judge Sacks. He was found fit by Judge Porter and a jury rejected the claim of insanity. The evidence against him was overwhelming and it seemed to me that it was a [H]ail Mary pass

at the last minute on the defendant's part to get himself a new trial and it didn't work.

I think the defendant knew exactly what he was doing and exactly what he was saying, that these were volitional remarks and the defendant has not shown, has not overcome any presumption of fitness on his part. He got himself back here for one hearing, for a second hearing rather, now he's going - - but that was unsuccessful. We will see what happens from here on out. The motion for new sentencing is denied. I find that in a retrospective fitness hearing that James McDurmon was fit when he was sentenced on November 30th of 2011."

Thus, the court found that he was fit at the time of sentencing and denied request for a new sentencing hearing.

¶ 55    ANALYSIS

¶ 56    On appeal, defendant raises two arguments. Defendant primarily contends that he is entitled to a new retrospective fitness hearing, because the trial court erroneously placed the burden on him to prove that he was unfit at the time of his sentencing, contrary to section 104-11 of the Code of Criminal Procedure of 1963. 725 ILCS 5/104-11 (West 2018). In other words, he contends that the court failed to require the State to prove that he was fit at the time of his sentencing, as required by the statute. Alternatively, in the event we do not remand for a new retrospective fitness hearing, defendant challenges the imposition of a 60-year sentence as excessive and an abuse of discretion. As discussed below, we agree that the trial court erred at

the retrospective fitness hearing with respect to the proper burden of proof, requiring remand for a new hearing.[2]

¶ 57    Defendant's Argument Is Reviewable Under the Plain-Error Doctrine

¶ 58    We first address whether forfeiture precludes our review. Defendant acknowledges that during the retrospective fitness hearing, he did not object to the court's statements indicating that the burden was on defendant to prove his lack of fitness. Generally, a claim is forfeited by failure to raise an objection with the trial court. See *People v. McLaurin*, 235 Ill. 2d 478, 485 (2009) ("to preserve a claim for error for review, counsel must object to the error at trial and raise the error in a motion for a new trial before the trial court" (citing *People v. Enoch*, 122 Ill. 2d at 185-86 (1988)).

¶ 59    Defendant urges a number of reasons why forfeiture does not bar our review of the trial court's purported error regarding the burden of proof.  First, he urges there is no forfeiture because his claim concerns the court's conduct. See *People v. Sims*, 192 Ill. 2d 592, 636 (the waiver rule "is not rigidly applied where the basis for the objection is the conduct of the trial judge. [Citations.]"). He further claims that the trial court's statements reflect that "any objection would have been futile."  Alternatively, he asserts that his trial counsel "provided ineffective assistance for failing to argue that the burden of proving fitness belonged to the State." He

---

[2] We note that this court issued a Rule 23 order in this matter on June 30, 2022, which reversed and remanded for the reasons discussed herein but further directed that on remand, a different judge should preside over the new retrospective fitness hearing. On November 30, 2022, our supreme court entered a supervisory order directing us to vacate only the portion of our Rule 23 order directing that the matter be reassigned to a different judge on remand. In light of that supervisory order, this court withdrew the June 30, 2022, Rule 23 order. The instant decision has been revised to be consistent with the supervisory order but makes no other changes to the reasoning of our prior Rule 23 order.

otherwise urges that we should review his claim under the second prong of the plain-error doctrine. We need not discuss each of these specific contentions, since (as the State concedes) the claim is reviewable under the plain-error doctrine.[3]

¶ 60    "[T]he plain-error doctrine bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved error when either (1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence." *People v. Fort*, 2017 IL 118966, ¶ 18. "Under both prongs of the plain-error doctrine, the defendant has the burden of persuasion." *People v. Hillier*, 237 Ill.2d 539, 545 (2010). Under the first prong, a defendant must show that "a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error." *People v. Thompson*, 238 Ill. 2d 598, 613 (2010) (quoting *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007)). Under the second prong, a defendant must show that "a clear or obvious error occurred and that the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Id.*

¶ 61    As "fitness for trial *** involves a fundamental right" "courts have repeatedly determined that alleged errors concerning fitness may be reviewed under the plain error doctrine. [Citations.]" *People v. Gipson*, 2015 IL App (1st) 122451, ¶ 28. More specifically, our court has found that the second prong of the plain-error doctrine applies to claims regarding fitness determinations. See, e.g., *People v. Khan*, 2021 IL App (1st) 190051, ¶ 63 ("Since the right to be fit for trial is 'fundamental,' the question as to a defendant's fitness may be reviewed for plain

---

[3] In its brief, the State "agree[s] that Illinois courts have repeatedly held that alleged errors concerning fitness may be reviewed for plain error."

error under the second prong."); *People v. Moore*, 408 Ill. App. 3d 706, 710 (2011) (because "[a] defendant's fitness for trial is a fundamental right," applying second prong plain-error review to claim that defendant's statements raised a *bona fide* doubt as to his fitness for trial). We thus proceed to review defendant's claim of error under the second prong of the plain error doctrine.

¶ 62    "The initial analytical step under either prong of the plain error doctrine is determining whether there was a clear or obvious error at trial." *People v. Sebby*, 2017 IL 119445, ¶ 49; see also *Thompson*, 238 Ill. 2d at 613 ("The first step of plain-error review is determining whether any error occurred. [Citation.]"). Thus, we first assess whether the trial court's comments regarding the burden of proof at the retrospective fitness hearing amounted to a clear or obvious error. We find that there was such error, as the trial court clearly indicated it was applying the wrong burden of proof as to defendant's fitness, contrary to the governing statute and supreme court precedent.

¶ 63    "Due process bars the prosecution or sentencing of an unfit defendant. [Citations.]" *People v. Tolefree*, 2011 IL App (1st) 100689, ¶ 55. Under the Code of Criminal Procedure of 1963, "A defendant is presumed to be fit to stand trial or to plead, and be sentenced. A defendant is unfit if, because of his mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense." 725 ILCS 5/104-10 (West 2018). "The issue of the defendant's fitness for trial, to plead, or to be sentenced may be raised *** at any appropriate time," including after trial. 725 ILCS 5/104-11(a) (West 2018).

¶ 64    "When a *bona fide* doubt of the defendant's fitness is raised, the court shall order a determination of the issue before proceeding further." *Id.* That is, "[o]nce facts are brought to the trial court's attention that raise a *bona fide* doubt as to defendant's fitness to stand trial or be

sentenced, the court has a duty to order a fitness hearing *sua sponte*. [Citations.]" *Tolefree*, 2011 IL App (1st) 100689, ¶ 56. "There is a *bona fide* doubt as to defendant's fitness if there is a 'real, substantial, and legitimate doubt' assessed against an objective standard. *Id.* (quoting *People v. Eddmonds*, 143 Ill. 2d 501, 518 (1991)).

¶ 65     Significantly, the presumption of fitness under section 104-10 of the Code no longer applies once a *bona fide* issue has been raised, at which point the burden shifts from defendant to the State. As stated by our supreme court: "Fundamental fairness dictates that, where a defendant has raised a *bona fide* doubt as to his fitness to stand trial, the State, as a matter of due process, should bear the ultimate burden of proving defendant's fitness to stand trial." *People v. McCullum*, 66 Ill. 2d 306, 311 (1977). Accordingly, section 104-11(c) of the Code provides:

> "When a *bona fide* doubt of the defendant's fitness has been raised
>
> the burden of proving that the defendant is fit by a preponderance
>
> of the evidence and the burden of going forward with the evidence
>
> are on the State. However, the court may call its own witnesses and
>
> conduct its own inquiry." 725 ILCS 5/104-11(c) (West 2018).

¶ 66     Here, the transcript of the retrospective fitness hearing reflects a "clear or obvious error" by the trial court as to which party bore the burden of proof, meeting the first step of the plain-error inquiry. See *Sebby*, 2017 IL 119445, ¶ 49. Our prior order in this case made clear our conclusion that there was a *bona fide* doubt as to defendant's fitness at the time of sentencing, which was the precise reason we remanded for a retrospective hearing. *McDurmon*, 2014 IL App (1st) 113585-U, ¶ 31. Accordingly, pursuant to section 104-11(c), it became the State's burden to prove that defendant was fit at the time of sentencing. 725 ILCS 5/104-11(c) (West 2018).

¶ 67    Contrary to the Code, the trial court's comments at the retrospective fitness make clear that it erroneously believed that defendant bore the burden to show that he was unfit. At the close of evidence and before argument, the trial court told defense counsel "you certainly bear the burden." When defense counsel questioned that premise, the trial court reiterated that defendant "bears the burden of proving that facts known to the Court raised a real, substantial, and legitimate doubt as to his mental capacity to meaningfully participate in his defense and cooperate with counsel." Later, in explaining its decision, the court incorrectly stated: "There is a presumption of fitness and James McDurmon bears the burden of showing that he is not fit." The court went on to conclude that defendant "has not overcome any presumption of fitness on his part."

¶ 68    Notably, the State's brief acknowledges that the trial court's comments on the burden of proof were erroneous:

> "Although the circuit court accurately recites language from this Court's opinion on direct appeal, it did so out of context and therefore erroneously when considering that this Court had already ruled that a *bona fide* doubt of petitioner's fitness for sentencing existed."

We thus find that defendant has met the first step of plain error review.

¶ 69    The next step in the second prong plain-error analysis is to "decide whether the defendant has shown that the error was so serious it affected the fairness of the trial and challenged the integrity of the judicial process. [Citations.]" *Sebby*, 2017 IL 119445, ¶ 50. "If the defendant carries that burden, '[p]rejudice *** is presumed because of the importance of the right

involved.' " *Id.* (quoting *People v. Herron*, 215 Ill. 2d 167, 187 (2005)). Importantly, this presumption of prejudice applies "*regardless* of the strength of the evidence." (Emphasis in original; internal quotation marks omitted). *Thompson*, 238 Ill. 2d 598, 613; see also *People v. Blue*, 189 Ill. 2d 99, 138 (2000) ("[W]hen an error arises at trial that is of such gravity that it threatens the very integrity of the judicial process," "the [reviewing] court will act on plain error *regardless* of the strength of the evidence of defendant's guilt."). "Stated another way, for second-prong error, the commission of the error is *itself* the prejudice because the right involved is so important." *People v. Jackson*, 2021 IL App (1st) 180672, ¶ 36.

¶ 70    Keeping in mind that the weight of the evidence is not part of the inquiry, we find that defendant has shown second prong plain error. That is, the trial court's erroneous statements about the burden of proof "affected the fairness of the trial and challenged the integrity of the judicial process." *Sebby*, 2017 IL 119445, ¶ 50. Simply put, the court's application of the wrong burden compromised the fairness of the proceeding. Because of the importance of the right involved, the error is presumptively prejudicial, regardless of whether the evidence at the hearing was close.

¶ 71    In reaching this conclusion, we emphasize our supreme court's statement that "fundamental fairness" requires that "where a defendant has raised a *bona fide* doubt as to his fitness to stand trial, the State, as a matter of due process, should bear the ultimate burden of proving defendant's fitness to stand trial." *McCullum*, 66 Ill. 2d at 314. Although *McCullum* specifically referred to fitness to stand trial, our supreme court has indicated that the same due process concerns apply to ensuring a defendant's fitness for sentencing. See *People v. Sandham*, 174 Ill. 2d 379, 382 (1996) ("Due process bars prosecuting *or sentencing* a defendant who is not

competent to stand trial." (Emphasis added) (citing *People v. Eddmonds*, 143 Ill.2d 501, 512-13 (1991))); *People v. Kinkead*, 182 Ill. 2d 316, 336 (1998) ("Due process of law prohibits the conviction *and sentencing* of a person who is incompetent to stand trial. [Citations.]"); see also *People v. McCallister*, 193 Ill. 2d 63, 111 (2000) ("Because it is a violation of due process to convict a defendant who is mentally unfit to stand trial, a judge has a duty to order a fitness hearing *sua sponte* once facts are brought to the judge's attention that raise a *bona fide* doubt of the accused's fitness to stand trial *or be sentenced.* [Citation]." (Emphasis added)). This is consistent with the governing statute, which does not differentiate between "fitness for trial, to plead, *or to be sentenced*" in providing that "[w]hen a bona fide doubt of the defendant's fitness has been raised, the burden of proving that the defendant is fit by a preponderance of the evidence" is on the State. (Emphasis added.) 725 ILCS 5/104-11(a),(c) (West 2018). Thus, we find that fundamental fairness and due process required the State to bear the burden of persuasion as to defendant's fitness at the time of sentencing, given our prior order's conclusion that a *bona fide* doubt had been raised.

¶ 72    The trial court's remarks reflect that, notwithstanding our court's explicit finding of a *bona fide* issue as to defendant's fitness at sentencing, it did not require the State burden to show defendant's fitness. Rather, at three different points, the court erroneously stated that the opposite burden applied: (1) before closing arguments, the court told defense counsel "you certainly bear the burden," (2) in explaining its findings, the trial court said "[t]here is a presumption of fitness and [defendant] bears the burden of showing that he is not fit," and (3) in stating its ruling, the trial court remarked that defendant had "not overcome any presumption of fitness on his part." The repetition of this error indicates that it was not merely a slip of the tongue or an inadvertent

misstatement, but that the court firmly believed that it was defendant's burden to show his unfitness at sentencing, when the law required the opposite. The court's comments undermines its factual findings, as they suggest that the court relied on an erroneous presumption against the defendant in deciding the ultimate issue of fitness. The court's apparent application of an incorrect presumption necessarily compromised the fairness of the proceeding, constituting second prong plain error and requiring reversal for a new hearing.

¶ 73    This conclusion is consistent with the reasoning of *People v. Hancock*, 59 Ill. App. 3d 596 (1978), relied upon defendant, which also concerned application of the wrong burden of proof as to fitness. The *Hancock* defendant was found fit for trial after a hearing where two psychiatrists offered conflicting opinions. *Id.* at 598. At the time of the hearing, section 5-2-1(i) of the Unified Code of Corrections provided that " '[t]he burden of proving the defendant is not fit is on the defendant if he raises the question and on the State if the State or the court raises the question.' " *Id.* at 599 (quoting Ill. Rev. Stat. 1975, ch. 38, par. 1005-2-1(i)).  However, pursuant to our supreme court's decision in *People v. McCullum*, 66 Ill. 2d 306 (1977), that statutory provision was held "unconstitutional to the extent that it places on the defendant the ultimate burden of proving his unfitness to stand trial." *Hancock*, 59 Ill. App. 3d at 599. In *Hancock*, this court recognized *McCullum*'s holding that " 'where a defendant has raised a bona fide doubt as to his fitness to stand trial, the State, as a matter of due process, should bear the ultimate burden of proving defendant's fitness to stand trial.' " *Id.* (quoting *McCullum*, 66 Ill. 2d at 314).

¶ 74    The *Hancock* defendant argued he was entitled to a new hearing, since he was found fit "pursuant to a statute which improperly placed the burden of persuasion upon him." *Id.* at 598. Our court agreed, noting that although the trial judge "did not specially mention who carried the

burden of persuasion", it assumed that the trial court "followed the clear direction of section 5-2-1(i). [Citations.]" *Id*. at 599. The *Hancock* decision proceeded to conclude that "*McCullum* dictates a reversal and remandment" for a new hearing. *Id.* at 600.

¶ 75     In so doing, the *Hancock* court rejected the State's argument that since the trial court found defendant fit, "it must have found that the preponderance of the evidence established defendant's fitness, and we should therefore affirm the determination." *Id. Hancock* explained:

> "A court of review may not speculate as to what result the trier of
> fact, whether judge or jury, would have reached had the burden of
> proof been allocated differently. This is especially true where, as
> here, the record reveals that the evidence presents a close question
> as to defendant's fitness. [Citations.]" *Id.* at 600-01.

*Hancock* thus vacated the finding of fitness and remanded "for a new fitness hearing during which the proper burden must be imposed." *Id.* at 602-03.

¶ 76     We agree with *Hancock* that a new fitness hearing is appropriate where the trial court erroneously placed the burden of persuasion on defendant. Indeed, *Hancock* found a new hearing was necessary even where the trial court "did not specifically mention who carried the burden of persuasion." *Id*. at 599. The reason for remand is even stronger in the instant case, where the trial court expressly stated that it was the defendant's burden to prove his unfitness, when the law required the opposite.

¶ 77     In short, the trial court's application of the wrong burden was a "clear or obvious" error which was "so serious it affected the fairness of the defendant's [hearing] and challenged the

integrity of the judicial process, regardless of the closeness of the evidence." *Sebby,* 2017 IL 119445, ¶ 48. This is all that is necessary to warrant reversal as second-prong plain error.

¶ 78    Harmless Error Is Inapplicable to Second-Prong Plain Error

¶ 79    We write further to rebut the State's contention that the trial court's error regarding the burden of persuasion was "harmless" given the evidence at the hearing. The State urges: "Since the circuit court's finding in this case was well-supported by the record, the result would have been the same regardless" of the court's error.  At oral argument, the State similarly urged that we should affirm because the court's finding of fitness was based on its due consideration of the evidence, even if it stated the wrong legal standard as to which party bore the burden of persuasion.

¶ 80    The State relies on *People v. Strickland*, 154 Ill. 2d 489 (1992) for its harmless error argument, but that case is distinguishable. *Strickland* concerned a pre-sentencing fitness hearing at which the defense presented a stipulation that defendant had received a psychotropic drug during trial, *id.* at 505-06, after which the State then presented a psychiatrist's testimony  that the drug would not have compromised defendant's fitness to stand trial. *Id.* at 506-07. On appeal from the trial court's finding of fitness, defendant argued that since defense counsel proceeded first in presenting evidence and argument, the trial court's procedures "improperly shifted to the defense the burden of persuasion" of establishing unfitness *Id.* at 511. *Id.* The State argued that this issue was waived by defense counsel's failure to object. *Id.* at 508-09. In response, defendant argued that his alleged unfitness "precludes any waiver argument and that, in any event, defense counsel was ineffective." *Id.* at 509.

¶ 81    Our supreme court found that defendant's arguments were "best resolved as matters pertaining to the effective assistance of counsel." *Id.* at 509-510. The court recited the two-part standard for ineffective assistance of counsel, which requires deficient performance as well as resulting prejudice. *Id.* at 510 (discussing *Strickland v. Washington*, 466 U.S. 668 (1984)). Our supreme court proceeded to find that defendant could not satisfy the prejudice requirement. *Id.* at 510. Specifically, although the trial court's procedures indicated that defendant bore the burden of persuasion, "any error in this regard was harmless", as "[t]here was no evidence at the hearing to indicate that the defendant was other than fit." *Id.* at 511. Under that record, our supreme court could not "say that the procedures followed by the trial court *** had any effect on the outcome of the hearing." *Id.* at 511-12.

¶ 82    *Strickland* is easily distinguishable from this case for two reasons. First, the claimed error in *Strickland* was merely that defendant presented its evidence and argued before the State, implying the wrong the burden of persuasion. In the instant case, the trial court explicitly stated, erroneously, that it was the defendant's burden to show that he was not fit.  Second, *Strickland* in no way suggests that a second-prong plain error can be deemed "harmless." Rather, our supreme court's finding that the error in that case was "harmless" stemmed from its conclusion that defendant could not show the requisite prejudice to establish ineffective assistance of counsel. *Id.* at 509-512. Thus, *Strickland* does not support the State's harmless error argument in this case.

¶ 83    In sum, a "harmless error" inquiry is irrelevant to our second-prong plain error analysis, in which prejudice "is presumed because of the importance of the right involved, *regardless* of the strength of the evidence. [Citations.]" (Emphasis in original.) *Thompson*, 238 Ill. 2d at 613. Our concern is not the closeness of the evidence, but whether the error "was so serious it affected

the fairness of the trial and challenged the integrity of the judicial process." *Sebby*, 2017 IL 119445, ¶ 50.

¶ 84    In this case, the trial court's application of the wrong burden of persuasion made the hearing unfair, since "[f]undamental fairness" and "due process" required the State to bear the burden given the *bona fide* doubt of defendant's fitness. *McCullum*, 66 Ill. 2d at 314. This was second-prong plain error, requiring reversal and remand for a new retrospective sentencing hearing.

¶ 85    Because the new retrospective fitness hearing may lead to resentencing, we do not proceed to address defendant's alternative argument that his 60-year sentence was excessive.

¶ 86    For the foregoing reasons, we reverse the determination of fitness at the retrospective fitness hearing and remand for a new retrospective fitness hearing consistent with this order.

¶ 87    Reversed and remanded.